Delaney, J.
{¶1} Appellant Leah M. Frank appeals from the December 14, 2017 Entry of conviction and sentence of the Muskingum County Court of Common Pleas. Appellee is the state of Ohio.
FACTS AND PROCEDURAL HISTORY
The Collection
{¶2} Carol Bosson has collected American pottery since the late 1980s and owns a vast collection numbering between 2200 and 2500 pieces. Her collection includes cookie jars, banks, planters, lawn ornaments, and other decorative items. The collection includes items from a number of American makers, although one of Bosson's favorites is McCoy.
{¶3} Bosson was qualified at trial as an expert witness in pottery and described the process of collecting American pottery. Some of her cookie jars, for example, are rare and valuable. Although the items were mass-produced, they were hand-painted and hand-decorated, and many pieces did not survive. An item's value is therefore based upon its condition and its rarity. Bosson is a member of several cookie-jar collectors' clubs and some of her jars have been photographed for inclusion in cookie-jar guides. These guides illustrate the various decorative differences and state the approximate retail value of the jars, which range from a few hundred dollars to several thousand dollars.
{¶4} Reproductions of pottery are common but distinguishable from genuine items. Bosson testified the dimensions of reproductions are smaller because producers don't have access to the original molds. Dimensions are therefore important to gauging the authenticity of pieces and are listed in the cookie-jar books. Only one of Bosson's jars was a reproduction and she bought it as a reproduction. She testified all of her jars are genuine, thus correlating to the high retail values. The overall value *367 of Bosson's collection is also based in part on its completeness.
{¶5} Bosson sought rare items but also collected duplicates of items already in her collection, to trade to other collectors. Most of her jars were purchased at auction. Bosson and other collectors rely upon "pickers" who attend auctions with lists of items sought by collectors. These lists are known as "want lists." The "pickers" might not be knowledgeable about pottery, but if they come across an interesting piece they will photograph it and/or purchase it for the collectors.
{¶6} Bosson knows other cookie-jar collectors throughout the country, including Jamie Melton, a Virginia resident. Melton also collects McCoy pottery and has seen Bosson's collection. Generally, however, Bosson is hesitant to show her collection because she is concerned about security.
{¶7} Appellee's exhibits P-1 through P-14 illustrate Bosson's collection in the basement of a house she owned in New Concord, Muskingum County, Ohio. Countless pieces of pottery are arranged in rows on shelves. A defense witness described the basement as a "pottery museum." Some of Bosson's favorite pieces were also kept in the upstairs living area of the house.
The tenants
{¶8} Bosson worked at J.C. Penney's, where she became "best friends" with appellant. In 2013, Bosson no longer lived at the New Concord residence but didn't have the time or the space in her new home to move everything from the New Concord house. Appellant and her fiancé, Lee Goldsmith, needed a place to live and asked Bosson if they could live at her house in exchange for taking care of it and watching over her property. Bosson believed it would be safer to have someone living at the house, so she agreed to have appellant and Goldsmith move in for the rent of $400/month and electricity. Bosson trusted appellant and discussed the agreement at length with her. The house was heated by free natural gas from a well. Much of Bosson's property remained, including furniture, clothing, bedding, and the pottery collection in the basement.
{¶9} The house has three bedrooms, two of which were filled with Bosson's property and were thus unusable by the tenants. Appellant and Goldsmith had access to the master bedroom, both bathrooms, the living room, kitchen, and basement. Bosson explained she couldn't keep the basement locked because the "mechanicals" of the house were there, including the washer and dryer, furnace, and hot-water heater. The basement does not contain any living space and, as shown by appellee's photos, is full of shelves of pottery. Goldsmith testified the tenants were nervous upon doing laundry due to the risk of harming any of the pottery.
{¶10} Bosson and appellant discussed the pottery collection in the basement, with appellant under strict orders not to touch, clean, move, or disturb the shelves of pottery in any way. Bosson felt comfortable with the arrangement because appellant told her daily how much she "loved" her and that she was grateful that Bosson provided a place to live.
{¶11} At one point during the 3-year tenancy, Bosson encountered another co-worker who asked her about her huge pottery collection. Bosson was concerned to learn appellant had shown the co-worker the collection without permission to do so. Bosson was uneasy but appellant and Goldsmith remained in the residence. At another point, a basement wall crumbled due to water damage and Bosson boxed up some of the pottery and removed it. At that time, Bosson testified, several light *368 bulbs in the basement didn't work and she couldn't readily see the entire collection.
{¶12} In late 2016, the natural gas was turned off. Appellant and Goldsmith complained that they didn't have any heat or hot water, and moved out on December 22, 2016. In checking the residence, Bosson went to the house on December 26 or 27 and found a key broken off in the door and a note stating the pair had moved out. Bosson replaced the light bulbs in the basement and discovered the pottery collection had been disturbed and many pieces were missing.[1] The total value of the missing pieces is approximately $32,000.
Theft connected to Appellant and Renick
{¶13} Jeff Snyder is a local antiques dealer who handles pottery. Bosson told him key pieces of her collection were missing. She learned Jamie Melton had several of her most valuable pieces, including, e.g., a McCoy leprechaun, Apollo jar, and red squirrel. Bosson also learned Melton got the items from a "picker" who bought them from someone named Shawn.
{¶14} Bosson knew Shawn Renick was appellant's son, although she had never met him. On January 3, 2017, Bosson reported the theft to the Muskingum County Sheriff's Department and provided the names of three suspects: appellant, Lee Goldsmith, and Shawn Renick.
{¶15} Jane Doe is the minor daughter of Valerie Barker, Shawn Renick's ex-girlfriend. Deputy Howe questioned Doe about the missing pottery and Doe testified reluctantly on behalf of appellee at trial. Doe said she visited appellant's home several times with her mother and Renick. Doe was well aware of the large pottery collection in the basement: appellant showed it to her and told her it had belonged to her daughter, Shayla, who passed away. Doe had no reason to believe the pottery belonged to anyone else.
{¶16} Doe testified she was present when Renick took pottery from the house 3 or 4 times. She said Goldsmith was usually upstairs when this occurred, but she, her mother, Renick, and appellant would gather pottery in the basement, put it in boxes, and place it in Renick's car. Doe testified that appellant was always present when this occurred, and appellant told Renick which boxes to take. The pottery was sometimes covered in the boxes, but Doe noticed in particular a Star Wars "C-3PO," an "Aunt Jemima" figure, and a "Dough Boy cookie jar." There were other items Doe did not specifically remember. Doe said Renick would bring the boxes of pottery home where they could remain for a few days before he would take them to a shop to sell.
{¶17} Doe said she had no motivation to lie about appellant's involvement. Appellant was always nice to her; she liked appellant; and had a good opinion of her. Doe never had any reason to believe the pottery had not belonged to Shayla.
{¶18} On cross-examination, Doe said she didn't discuss her testimony with her mother or Renick. She said she was sometimes outside in the car when Renick sold the pottery at a shop, but he did not give Doe or her mother any money from the sales. Doe said she answered the deputy's questions openly and honestly at school.
Desirable jars come up for sale
{¶19} Relics Antique Mall is owned by Robert Lamay. One of Lamay's employees testified she was familiar with Shawn Renick because she was present 4 or 5 times when Renick brought in cookie jars to sell.
*369 He brought several jars in a box each time. Sometimes Renick was accompanied by his girlfriend, Valerie Barker. The employee would leave the items with a note for Lamay asking if he wanted to buy any of the jars. The employee testified that the first time he came in, Lamay sent Renick to Jeff Snyder, a dealer at a different shop that handled pottery.
{¶20} Robert Lamay testified for appellee that Renick began selling pottery around September 1, 2016. The first time Renick came in, Lamay sent him to another dealer. Lamay knows Jamie Melton and contacted him regarding the first jars Renick brought in. Melton was "not excited" about the jars because they were not rare and he wasn't interested in buying them.
{¶21} Renick told Lamay, though, that he had access to rare jars. Renick told Lamay his grandfather "worked next to Nelson McCoy" and "had a barn full" of rare McCoy jars. Lamay testified that he "checked out" the story and it made sense to him.
{¶22} Lamay started buying the jars brought in by Renick. He took pictures of the jars and sent the pictures to Melton to see if he was interested. Some Melton bought, others Lamay placed in his shop or online and sold to other people. Renick came in often, perhaps as many as 15 times, according to Lamay, and usually brought in at least two jars in boxes. Lamay didn't buy every item Renick brought in.
{¶23} Lamay prepared receipts for Renick's items dated throughout October. Renick signed the receipts.
{¶24} When Lamay learned of the investigation, he locked up the remaining items in his possession that Renick sold to him. Appellee's exhibits P-15 and P-16 are photos of display cases in Lamay's shop. The photos show several of the McCoy cookie jars Bosson found to be missing from her collection, including, e.g., a "baseball boy," a white strawberry, a touring car, a "sack of cookies," a pelican, a caboose, and a "choo-choo." Also visible on a shelf is the McCoy "C3PO."
{¶25} Appellee's exhibits also included pieces of McCoy pottery, including the following McCoy items recovered from Melton: a fox squirrel, a leprechaun, an "Uncle Sam" hat, an Apollo, a "Cauliflower Mammy," a "slant top teepee," and a globe with an intact jet on top.[2] Bosson testified these items are "top shelf" rare McCoy and among her most valuable. The red fox squirrel, for example, is valued at $4,345 and the leprechaun at $2500. Appellee's exhibit 2 is a list of recovered and missing pottery and the values of each. Bosson testified the values are based upon what she paid for the items, as documented by receipts and checks in appellee's exhibit 1, or by values stated in cookie-jar books.
Defense case
{¶26} Valerie Barker testified as a defense witness at trial. She said Renick, her ex-boyfriend, was controlling and physically abusive. She admitted she has been in the basement of Bosson's house with appellant, who showed her the pottery and "acted like it was hers." Barker testified she accompanied Renick several times to Relics Antique Mall. On cross-examination, Barker testified she saw appellant give Renick a box; he brought the box to Relics; and the box contained pottery. Barker believed the pottery belonged to appellant and Renick's grandfather. Barker said appellant told Renick what to take.
*370 {¶27} Deputy Howe was also called as a defense witness. He testified he interviewed Jane Doe at school because he is a school resource officer. Doe told him she was present several times when cookie jars were brought out of the basement to be sold and she thought the pottery belonged to appellant.
{¶28} Two friends of appellant's testified that Renick is controlling and abusive. They have both been in Bosson's basement and have seen the collection of pottery. Neither believed appellant capable of stealing the pottery.
{¶29} Lee Goldsmith testified on appellant's behalf and acknowledged that he was a "nervous wreck" about the pottery in the basement. He respected the value of the collection because he once worked for Nelson McCoy. It was understood that he and appellant would not touch the pottery. Goldsmith testified appellant and Renick have a troubled relationship but Renick was at the house sometimes by himself. Renick sometimes did laundry in the basement. Goldsmith testified he never saw appellant, Renick, or anyone other than Bosson ever take pottery out of the basement.
{¶30} On cross-examination, Goldsmith said despite his respect for the collection he believes "a lot of it is fake" and he knows that because he picked up pieces and looked at them.
{¶31} Appellant testified on her own behalf. She denied stealing pottery and denied allowing Renick to steal pottery. She acknowledged she showed the pottery to various people over the time she lived there but said she never told anyone it belonged to her or her deceased daughter. She implied Renick and unidentified others had access to the basement when she was away from the house. She denied Barker's story that she personally directed Renick to take boxes out of the basement. She testified she has no idea which pieces of pottery are valuable.
Indictment, trial, and misdemeanor conviction
{¶32} Appellant and Shawn Renick were charged in a single indictment with one count of theft in an amount greater than $7500 and less than $150,000, a felony of the fourth degree pursuant to R.C. 2913.02(A)(1). The indictment alleges the pair stole miscellaneous pottery from Carol Bosson between the dates of October 1, 2016 and December 23, 2016.
{¶33} Appellant entered a plea of not guilty and filed a motion to sever her trial from that of Renick. Appellee did not oppose the motion to sever, and the trial court granted the motion for separate trials. The matter proceeded to trial by jury and appellant was found guilty of theft in an amount less than $7500. The trial court thereupon entered a Judgment Entry of conviction of theft as a misdemeanor of the first degree on November 30, 2017.
{¶34} On December 13, 2017, a restitution hearing was held. The trial court's sentencing entry of December 14, 2017, states appellant was sentenced to a 6-month jail term with all but 30 days suspended on the condition that she complete a 5-year period of community control. Included in the sanction is a restitution order totaling $20,960, which is to be disbursed by the Clerk of Court as follows: $16,370 to Carol Bosson, $3150 to Jamie Melton, and $1440 to Robert Lemay.
{¶35} Appellant appeals from the trial court's entry of conviction and sentence dated December 14, 2017.
{¶36} On March 14, 2018, appellant filed motions to supplement the appellate record with the pre-sentence investigation (P.S.I.) in the instant case, which we granted on March 21, 2018, and the judgment entry of Renick's conviction. We have *371 granted the latter by separate judgment entry.
{¶37} The Entry dated February 27, 2018 in Muskingum County Court of Common Pleas Case Number CR2017-0301, State of Ohio v. Shawn E. Renick, indicates Renick entered a plea of guilty to one count of theft pursuant to R.C. 2913.02(A)(1) in an amount greater than $7,500 but less than $150,000, a felony of the fourth degree. The sentence includes, e.g., a restitution order totaling $20,960 to be disbursed by the Clerk of Court as follows: $16,370 to Carol Bosson, $3150 to Jamie Melton, and $1440 to Robert Lemay.
{¶38} Appellant raises three assignments of error:
ASSIGNMENTS OF ERROR
{¶39} "I. APPELLANT'S CONVICTION FOR THEFT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
{¶40} "II. THE TRIAL COURT ABUSED ITS DISCRETION BY IMPOSING A 30-DAY JAIL TERM AS PART OF A COMMUNITY CONTROL SANCTION."
{¶41} "III. THE TRIAL COURT ERRED WHEN IT IMPOSED A FINANCIAL SANCTION OF RESTITUTION IN THE AMOUNT OF $20,960 AFTER THE APPELLANT WAS CONVICTED OF MISDEMEANOR THEFT."
ANALYSIS
I.
{¶42} In her first assignment of error, appellant argues her theft conviction is against the manifest weight of the evidence. We disagree.
{¶43} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." State v. Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." Id.
{¶44} Appellant was found guilty upon one count of theft pursuant to R.C. 2913.02(A)(1), which states: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent[.]" Appellant argues there is no evidence she took the pottery, assisted anyone else in taking the pottery, or gained anything from the theft of the pottery.
{¶45} We note, however, that appellee presented direct and circumstantial evidence that appellant aided and abetted the theft of the pottery. Jane Doe said appellant actively helped box up pottery and/or pointed out which pieces and boxes Renick should take. Appellant's own witness, Valerie Barker, testified appellant pointed out which items to take and oversaw the packing and removal of the boxes. Appellant's argument is premised solely upon the credibility of these witnesses, or lack thereof. The weight of the evidence and the credibility of the witnesses are determined by the trier of fact. State v. Yarbrough , 95 Ohio St.3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.
*372 {¶46} Moreover, we note there is circumstantial evidence appellant aided and abetted in the theft of the pottery: numerous witnesses, even appellant's friends, acknowledged she showed them the pottery collection despite Bosson's instructions not to do so. The sheer volume of the pottery theft makes it unlikely appellant was unaware of the pottery being removed from the house: the pieces were unwieldy and fragile, as is evident from the photos, and Renick delivered them to the antique shop in boxes. Renick was known to do his laundry in the basement, but he would have had no reason to bring boxes full of pottery out of the basement. Doe observed the C-3PO in one of those boxes and the C-3PO later appeared at Relics Antique Mall.
{¶47} Appellant points to minor inconsistencies in the testimony of Doe and her mother, Valerie Barker. Any inconsistencies in the witnesses' accounts were for the trial court to resolve. State v. Dotson , 5th Dist. Stark No. 2016CA00199, 2017-Ohio-5565, 2017 WL 2815197, ¶ 49. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." State v. Brindley, 10th Dist. Franklin No. 01AP-926, 2002-Ohio-2425, 2002 WL 1013033, ¶ 16. We defer to the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. State v. DeHass, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraph one of the syllabus. When assessing witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." State v. Pizzulo, 11th Dist. Trumbull No. 2009-T-0105, 2010-Ohio-2048, 2010 WL 1839440, ¶ 11. Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id.
{¶48} Inconsistencies in the testimony do not establish appellant's conviction is against the manifest weight of the evidence. Dotson , supra, 2017-Ohio-5565, at ¶ 50.
{¶49} We disagree that appellant was merely a "poor steward" of Bosson's property. Upon our review of the entire record, we conclude her theft conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Appellant's first assignment of error is overruled.
II.
{¶50} In her second assignment of error, appellant argues the trial court abused its discretion in imposing a jail term of 30 days. We disagree.
{¶51} Generally, misdemeanor sentencing is within the sound discretion of the trial court and will not be disturbed upon review if the sentence is within the limits of the applicable statute. State v. Thadur , 2016-Ohio-417, 59 N.E.3d 602, ¶ 11 (5th Dist.), citing State v. Smith, 9th Dist. Wayne No. 05CA0006, 2006-Ohio-1558, 2006 WL 826128, ¶ 21, internal citation omitted. See, also, State v. Chadwick, 5th Dist. Knox No. 08CA15, 2009-Ohio-2472, 2009 WL 1485036, ¶ 30. In order to find an abuse of discretion, the reviewing court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Furthermore, there is no requirement *373 that a trial court, in sentencing on misdemeanor offenses, specifically state its reasons on the record. State v. Harpster, 5th Dist. Ashland No. 04COA061, 2005-Ohio-1046, 2005 WL 567319, ¶ 20.
{¶52} The 30-day jail term is within the statutory range for a misdemeanor of the first degree. R.C. 2929.24(A)(1).
{¶53} R.C. 2929.21(A) first states that "[a] court that sentences an offender for a misdemeanor * * * shall be guided by the overriding purposes of misdemeanor sentencing. * * *." The overriding purposes of misdemeanor sentencing are to protect the public from future crime by the offender and others and to punish the offender. R.C. 2929.21(A). In order to achieve those purposes, a sentencing court must consider "the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." Id.; Thadur , supra, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 13, citing State v. Coleman, 4th Dist. Scioto No. 05CA3037, 2006-Ohio-3200, 2006 WL 1719348, ¶ 21.
{¶54} In addition, R.C. 2929.21(B) states in pertinent part as follows: "A sentence imposed for a misdemeanor * * * shall be reasonably calculated to achieve the two overriding purposes of misdemeanor sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar offenses committed by similar offenders."
{¶55} Thus, under R.C. 2929.21(A) and (B), in order to achieve the purposes of protecting the public from future crime and punishing the offender, the sentencing court is to inter alia consider the offender's conduct, the impact of the offender's conduct on the victims, and the consistency of the sentence with sentences for similar offenses. Thadur , supra, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 15.
{¶56} In regard to the statutory "overriding purposes" of misdemeanor sentencing, the record before us contains the pre-sentence investigation (P.S.I.) of the trial court and indicates appellant has no prior criminal record other than a traffic offense. She is not employed and does not receive disability. Appellant refused to complete the defendant's statement portion of the P.S.I. because "she proclaimed she cannot make a statement on something she is not guilty of." She did not express remorse or accept any responsibility for Bosson's losses. Bosson's victim statement in the P.S.I. indicates that appellant quit her job the day she moved into Bosson's house, and Bosson felt exploited and used. Appellant's constant reassurances that she "loved" Bosson and was appreciative of her providing a place to live led Bosson to trust appellant.
{¶57} Appellant further argues her sentence is disproportionate when compared with that of co-defendant Renick. Renick was neither convicted nor sentenced at the time appellant was sentenced. As noted supra, appellant supplemented the record with an entry indicating Renick entered a plea of guilty to one count of theft as a fourth-degree felony and was sentenced to a four-year term of community control, with no jail or prison term. Appellant further states Renick had a prior theft conviction, a matter which is not in the record before us. Nor are we privy to the underlying issues that may have made Renick's plea palatable to appellee and defendant. In regard to the consistency-in-sentencing argument, appellant bears a significant burden and must provide us with the detail necessary to *374 establish that the sentence is inconsistent with other relevant sentences. Thadur , supra, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 19, citing State v. Friesen, 3rd Dist. Crawford No. 3-05-06, 2005-Ohio-5760, 2005 WL 2840722, ¶ 16-19. Ohio courts have recognized that consistency in sentencing does not necessarily mean uniformity. See State v. Ryan, 1st Dist. Hamilton No. C-020283, 2003-Ohio-1188, 2003 WL 1094003, ¶ 10 (addressing felony sentencing). As an appellate court, we may decline to compare a particular defendant's sentences with similar crimes in this or other jurisdictions unless there is an inference of gross disproportionality. Thadur , supra, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 20, citing State v. King, 5th Dist. Muskingum No. CT06-0020, 2006-Ohio-6566, 2006 WL 3614754, ¶ 26 (addressing felony sentencing).
{¶58} We find appellant's disproportionality claim to be insufficient to warrant reversal of her sentence.
{¶59} Accordingly, upon review, we find the trial court properly considered the evidence at trial and the P.S.I. as part of its R.C. 2929.21 analysis. The trial court did not abuse its discretion in imposing, e.g., a jail term of 30 days.
{¶60} R.C. 2929.22 states in pertinent part as follows:
(A) Unless a mandatory jail term is required to be imposed * * * a court that imposes a sentence under this chapter upon an offender for a misdemeanor or minor misdemeanor has discretion to determine the most effective way to achieve the purposes and principles of sentencing set forth in section 2929.21 of the Revised Code.
Unless a specific sanction is required to be imposed or is precluded from being imposed by the section setting forth an offense or the penalty for an offense or by any provision of sections 2929.23 to 2929.28 of the Revised Code, a court that imposes a sentence upon an offender for a misdemeanor may impose on the offender any sanction or combination of sanctions under sections 2929.24 to 2929.28 of the Revised Code. The court shall not impose a sentence that imposes an unnecessary burden on local government resources.
(B)(1) In determining the appropriate sentence for a misdemeanor, the court shall consider all of the following factors:
(a) The nature and circumstances of the offense or offenses;
(b) Whether the circumstances regarding the offender and the offense or offenses indicate that the offender has a history of persistent criminal activity and that the offender's character and condition reveal a substantial risk that the offender will commit another offense;
(c) Whether the circumstances regarding the offender and the offense or offenses indicate that the offender's history, character, and condition reveal a substantial risk that the offender will be a danger to others and that the offender's conduct has been characterized by a pattern of repetitive, compulsive, or aggressive *608 behavior with heedless indifference to the consequences;
(d) Whether the victim's youth, age, disability, or other factor made the victim particularly vulnerable to the offense or made the impact of the offense more serious;
(e) Whether the offender is likely to commit future crimes in general, in addition to the circumstances described in divisions (B)(1)(b) and (c) of this section;
(f) Whether the offender has an emotional, mental, or physical condition that is traceable to the offender's service in the armed forces of the United States *375 and that was a contributing factor in the offender's commission of the offense or offenses;
(g) The offender's military service record.
(2) In determining the appropriate sentence for a misdemeanor, in addition to complying with division (B)(1) of this section, the court may consider any other factors that are relevant to achieving the purposes and principles of sentencing set forth in section 2929.21 of the Revised Code.
* * * *.
{¶61} Appellant argues the trial court did not properly weigh the statutory factors, but there is no requirement that the trial court cite the factors on the record. Even where a record is silent, we must presume the trial court considered the proper factors enumerated in R.C. 2929.22. Thadur , supra, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 26, citing State v. Kandel, 5th Dist. Ashland No. 04COA011, 2004-Ohio-6987, 2004 WL 2955228, ¶ 25.
{¶62} Upon review, we are unpersuaded the trial court's implicit determinations under R.C. 2929.22(C) under the circumstances presented were unreasonable, arbitrary or unconscionable. Thadur , supra, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 34. Appellant's second assignment of error is overruled.
III.
{¶63} In her third assignment of error, appellant argues the trial court erred in ordering her to pay restitution in the amount of $20,960 when she was convicted of theft as a misdemeanor of the first degree, or in an amount less than $7500. We disagree.
{¶64} We review restitution orders under an abuse-of-discretion standard. State v. Sheets , 5th Dist. Licking No. 17 CA 44, 2018-Ohio-996, 2018 WL 1358039, ¶ 15, citing State v. Cook , 5th Dist. Fairfield No. 16-CA-28, 2017-Ohio-1503, 2017 WL 1436377, ¶ 8 ; State v. Andrews, 5th Dist. Delaware No. 15 CAA 12 0099, 2016-Ohio-7389, 2016 WL 6138888, ¶ 40. We also recently reiterated that an order of restitution must be supported by competent and credible evidence from which the trial court can discern the amount of restitution to a reasonable degree of certainty. Sheets , supra, citing State v. Spencer , 5th Dist. Delaware No. 16 CAA 04 0019, 2017-Ohio-59, 2017 WL 90619, ¶ 44 (citations omitted). Furthermore, a trial court abuses its discretion if it orders restitution in an amount that does not bear a reasonable relationship to the actual loss suffered. Id. (citations omitted).
{¶65} R.C. 2929.28(A)(1) states in pertinent part:
In addition to imposing court costs pursuant to section 2947.23 of the Revised Code, the court imposing a sentence upon an offender for a misdemeanor * * * may sentence the offender to any financial sanction or combination of financial sanctions authorized under this section. If the court in its discretion imposes one or more financial sanctions, the financial sanctions that may be imposed pursuant to this section include, but are not limited to, the following:
* * * [R]estitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. * * * *. If the court requires restitution, the court shall order that the restitution be made to the victim in open court or to the adult probation department that serves the jurisdiction or the clerk of the court on behalf of the victim.
If the court imposes restitution, the court shall determine the amount of restitution *376 to be paid by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold an evidentiary hearing on restitution if the offender, victim, or survivor disputes the amount of restitution. If the court holds an evidentiary hearing, at the hearing the victim or survivor has the burden to prove by a preponderance of the evidence the amount of restitution sought from the offender.
* * * *.
{¶66} Also relevant, R.C. 2913.61(D) states in pertinent part: "The following criteria shall be used in determining the value of property * * * involved in a theft offense: The value of [a] * * * collector's item, antique, museum piece, * * * or other thing that has intrinsic worth to its owner and that either is irreplaceable or is replaceable only on the expenditure of substantial time, effort, or money, is the amount that would compensate the owner for its loss."
{¶67} As appellant acknowledges, the amount of restitution is not necessarily limited to the property value that corresponds to the degree of the theft offense. State v. Lalain, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, ¶ 24 ; State v. Daniels , 1st Dist, 2015-Ohio-5348, 45 N.E.3d 266, ¶ 25. Instead, the amount of restitution is restricted to "the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." See R.C. 2929.28(A)(1) ; see also R.C. 2929.01(L).
{¶68} In the instant case, the value of the pottery was in evidence at trial and at the subsequent restitution hearing. Appellee presented copious uncontroverted evidence as to the value of Bosson's stolen property. The amounts owed to Lamay and Melton were verified by the receipts and pottery that they surrendered to law enforcement. We find appellee established the victims' economic loss by a preponderance of the evidence; indeed, appellant does not argue otherwise.
{¶69} Appellant argues the trial court effectively imposed restitution for acts the jury did not find defendant guilty of committing, akin to State v. Simmons , 10 Dist., 2017-Ohio-1348, 88 N.E.3d 651 at ¶ 58. We find, though, that unlike Simmons , there was competent and credible evidence demonstrating that the amount ordered corresponded to economic loss suffered as a proximate result of appellant's theft.
{¶70} Appellant's third assignment of error is overruled.
CONCLUSION
{¶71} Appellant's three assignments of error are overruled and the judgment of the Muskingum County Court of Common Pleas is affirmed.
By: Delaney, J., Hoffman, P.J. and
Wise, Earle, J., concur.

Bosson also testified other property was missing, such as bedding, rugs, and household items.

The pottery exhibits were photographed and only the photos went back to the jury room to protect the fragile exhibits.