[Cite as *State v. Hodge*, 2020-Ohio-901.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. CT2019-0038 |
| | : | |
| JOSEPH D. HODGE | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Muskingum County
Court of Common Pleas, Case No.
CR2019-0119

JUDGMENT:     AFFIRMED IN PART, REVERSED IN
PART, AND REMANDED

DATE OF JUDGMENT ENTRY:     March 9, 2020

APPEARANCES:

For Plaintiff-Appellee:                     For Defendant-Appellant:

D. MICHAEL HADDOX                    OHIO PUBLIC DEFENDER
MUSKINGUM CO. PROSECUTOR      CRAIG M. JAQUITH
27 North Fifth St                            250 East Broad St., Ste. 1400
P.O. Box 189                                 Columbus, OH 43215
Zanesville, OH 43702

*Delaney, J.*

{¶1}   Appellant Joseph D. Hodge appeals from the April 17, 2019 Entry of the Muskingum County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2}   This case arose on October 28, 2018, when Miranda Thomas discovered two people were living in her house.  During the ensuing series of extraordinary events, appellant and his girlfriend Nikki Eblin attempted to steal the house from Thomas by, among other things, recording a fake deed.

{¶3}   In early 2017, Miranda Thomas was living with her mother in her mother's house on North Main Street in Roseville, Muskingum County.  Thomas' mother bought the house in 2010 but was now in ill health and required the services of a nursing home. Thomas' mother therefore transferred title to the house to Thomas and her brother, Marshall Sanderson.  A few months later, due to Medicare/Medicaid complications, the title was transferred into the name of Thomas alone.  In early April 2017, Thomas' mother passed away.

{¶4}   Thomas continued to live at the house with her two young children.  All of her own property was in the house, along with that of her mother and father.  Thomas' father passed away a few weeks after her mother.  Items belonging to Sanderson were also still in the house.  Around August 2017, Thomas received a notice of delinquent taxes on the property, and she paid them.  In October 2017, she was served with a lawsuit by her mother's former nursing home, which sought to foreclose against the home to recover fees for her mother's care.  Thomas hired an attorney specializing in real estate, Derrick Moorehead, to represent her in the lawsuit.

{¶5} Thomas periodically had problems with the boiler in the house, and in January 2018 it stopped working altogether. Because it was winter and the house had no heat, Thomas moved into her father's former residence a few blocks away. Thomas continued to drive by the house regularly and intended to eventually reside there.

{¶6} In June 2018, Thomas moved into her fiancé's residence in Coshocton. She continued to work in Crooksville, which allowed her to drive by and check on the house regularly. At the end of July, however, her car broke down, and she stopped working in Crooksville. She therefore drove by the Roseville residence less frequently. She continued to check on the residence approximately every two weeks, however, when her fiancé's children had visitation.

{¶7} In mid-October, Moorehead advised Thomas that the nursing home dismissed the lawsuit and was no longer pursuing the house; therefore, Thomas owned the house free and clear. Thomas signed a note and Moorehead took a mortgage on the property to cover his fees of $1900.

{¶8} On October 28, 2018, Thomas and her mother-in-law Wendy Yocum drove together to drop off the children after visitation, and took the opportunity to check on the Roseville house. The women were shocked to find the garage door open and an unfamiliar truck parked in the driveway. A box truck and a smaller trailer were also parked near the house. Thomas and Yocum dropped the children off before investigating further, and called the Muskingum County Sheriff's Department.

{¶9} While waiting for deputies to arrive, Thomas looked in the garage and found it unrecognizable. The garage had previously been divided in half, functioning as a music studio for her fiancé and a garage where Thomas stored her motorcycle. The motorcycle

and the fiancé's drums and music equipment were gone, replaced with property Thomas didn't recognize.

{¶10} Thomas proceeded into the house through an unlocked door, and found more of the same inside.  Some of the property of Thomas and her family was still present, but most was missing and the house was unrecognizable.  There was unfamiliar stuff everywhere.  Appliances were missing, there were holes in the walls, and entire bathrooms had been ripped out.  Thomas encountered appellant and his girlfriend, Nikki Eblin, coming down the stairs.  Thomas did not know either of them, and demanded to know why they were in the house and where her property was.  Appellant said this wasn't her house and she needed to get out.  He said he bought the house on land contract and Thomas demanded to know from who.

{¶11} As they argued, appellant and Eblin said they would call the police and Thomas said police were already en route.  Appellant stated, "Then I'll shoot you and your family," pulling up his shirt and revealing what Thomas believed to be a firearm in his waistband.  Thomas said she, too, had a concealed-carry permit and a firearm, although she had left it in the vehicle outside.

{¶12} Yocum and Sanderson were with Thomas; they exited the house and Thomas called the sheriff again to tell them the person in her house had a gun. Deputies arrived on the scene and questioned everyone.  Appellant insisted he was buying the house on land contract. Deputies were unable to determine who was in lawful possession of the house, told the parties it was a "civil matter," and suggested Thomas should file an eviction.  The first deputy on the scene testified at trial that his report writing on this case

was "poor," admitting that Yocum and Thomas told him appellant had a firearm but he neglected to document the allegation in the report.

{¶13} The parties remained on the scene after deputies left. Thomas and Yocum were in front of the house and Yocum leaned on the fence. Appellant came out of the house and put something under the front seat of his truck. He angrily demanded that Yocum move her car, and when she was slow to respond, he picked up what Yocum described as a "tire thumper" and menaced her with it, striking the fence close to her. Deputies returned to the scene and warned Thomas and Yocum that a civil matter could become criminal if they didn't leave.

{¶14} Thomas arrived at Derrick Moorehead's office early the next day (October 31) and he prepared a three-day eviction notice for her. Thomas returned to the house with a police officer to post the three-day notice. Three days later, the occupants had not vacated the premises. Thomas drove by the property and noticed more of her own personal property stacked up outside in a fire pit. She drove to the Roseville police department, which is only a half-block from the house. The house is visible from the parking lot; as Thomas spoke to Chief Carr, they observed heavy black smoke coming from the backyard of the residence. Carr found appellant in the backyard with a very large fire. Carr demanded that appellant put the fire out but had to call the fire department because the fire became too big for appellant to contain. The fire consumed a large amount of Thomas' personal property.

{¶15} Appellant was angry that the fire department was involved. Carr told appellant he was "squatting" at the residence, but appellant told him to speak to his

girlfriend because they were legally entitled to be there. Eblin claimed the utilities were in their names, and produced a gas bill as confirmation.

{¶16} The eviction hearing was not scheduled until November 21. Prior to the hearing, Moorehead spoke to appellant in the hallway and asked why he thought he was entitled to remain in possession of the property. To Moorehead's astonishment, appellant produced a deed to the property, signed by Thomas as grantor and appellant as grantee, purporting to have transferred the property in April 2018.

{¶17} Thomas denied all knowledge of the deed and told Moorehead she never sold the property to anyone. She pointed out that she could not have sold the property even if she wanted to in light of first the nursing-home lawsuit and then Moorehead's mortgage on the property. Thomas insisted it was not her signature on the deed, but her purported signature was notarized.

{¶18} As Moorehead and Thomas discussed the deed, Thomas was served with an ex-parte civil protection order obtained against her by Eblin. The immediate effect of the C.P.O. was that Thomas was not permitted to be in the courtroom during the eviction proceeding and she had to surrender her firearms.

{¶19} Meanwhile, Judge Scott Raskin of the Muskingum County Court of Common Pleas presided over the eviction hearing and was also surprised when appellant produced the deed establishing ownership of property. Judge Raskin treated the deed as a motion to dismiss the eviction. Moorehead moved to continue the eviction so he could investigate further, despite the fact that a continuance would enable appellant and Eblin to remain in the house. Judge Raskin agreed to continue the eviction.

{¶20} Appellant presented the deed for filing at the Muskingum County Recorder's Office and it was duly recorded. As of the date of trial, appellant was still the record owner of the property. Moorehead testified that he would have to file a declaratory judgment action on Thomas' behalf to have the deed struck from the chain of title.

{¶21} Throughout the eviction proceeding Moorehead was genuinely puzzled because he believed Thomas to be a truthful person, but her signature on the purportedly fake deed was notarized. Moorehead contacted the notary, Amy Adams, who said she remembered notarizing Thomas' signature and that she always asks to see a signatory's identification. She added, though, that she would not recognize Thomas if she saw her again. Moorehead found the conversation strange and began to suspect it was possible that the notary worked with appellant to falsify the deed.

{¶22} Moorehead was convinced the deed was fake when he obtained the report of the Muskingum County Sheriff's Department from the confrontation at the house on October 28. At that time, appellant and Eblin claimed they bought the house on land contract from a mortgage company; now, a month later, they produced a fake deed and claimed they purchased the house from Thomas in April.

{¶23} Moorehead contacted Detective Ross to urge further investigation of Thomas' allegations, finally yielding results. On December 6, 2018, Thomas was restored to possession of her home. Unfortunately, the home was full of someone else's property and very little of Thomas' possessions remained. She found some of her property for sale on Facebook Marketplace by appellant and Eblin, including her fiancé's drum set and guitar, her own china cabinet, her mother's hospital bed, and her stepson's golf bag.

{¶24} Throughout the house, Thomas found legal reference books about real estate, property transfers, and deeds. She found notebooks containing attempts to reproduce her signature.

{¶25} Amy Adams, the notary, testified on appellee's behalf at trial. She is a longtime friend of Eblin and also knows appellant. Eblin purportedly sold her own home and had nowhere to live with her children; she told Adams she and appellant "found" an abandoned home which they planned to move into and "flip." Eblin told her that if they moved into the house and took care of it, it would be theirs because no one else wanted it. At one point Eblin brought Adams to the house and she looked around inside. Then Adams learned someone came forward to assert ownership of the house, and appellant therefore needed a deed. He and Adams had several conversations about Adams falsely notarizing the signature of the grantor but at first Adams was "on the fence." Eventually she agreed to notarize the signature, however, because she was doing appellant and Eblin a favor. Adams learned there were problems surrounding the deed when an attorney [Moorehead] contacted her to ask about the circumstances of Thomas' signature. At trial Adams admitted she lied to Moorehead and Detective Ross, telling both that Thomas was present in front of her when she signed the deed. Adams admitted this was not true and acknowledged she would be charged with a crime for misuse of her notary.

{¶26} Appellant was charged by indictment with one counts of aggravated burglary pursuant to R.C. 2911.11(A)(1), a felony of the first degree [Count I]; one count of aggravated burglary pursuant to R.C. 2911.11(A)(2), a felony of the first degree [Count II]; one count of forgery pursuant to R.C. 2913.31(A)(1), a felony of the fifth degree [Count

III]; one count of vandalism in an amount greater than $7500 and less than $150,000 pursuant to R.C. 2909.05(A), a felony of the fourth degree [Count IV]; one count of arson in an amount over $1000 pursuant to R.C. 2909.03(A)(1), a felony of the fourth degree [Count V]; one count of tampering with evidence pursuant to R.C. 2921.12(A)(2), a felony of the third degree [Count VI]; one count of uttering pursuant to R.C. 2913.31(A)(3), a felony of the fifth degree [Count VII]; one count of tampering with records pursuant to R.C. 2913.42(A)(2), a felony of the third degree [Count VIII]; one count of engaging in a pattern of corrupt activity pursuant to R.C. 2923.32(A)(1), a felony of the first degree [Count IX]; and one count of engaging in a pattern of corrupt activity pursuant to R.C. 2923.32(A)(2), a felony of the first degree [Count X]. Counts I and II were accompanied by firearm and repeat-violent-offender (R.V.O.) specifications. Counts IX and X were accompanied by firearm specifications.

{¶27} Appellant entered pleas of not guilty and the matter proceeded to trial by jury, wherein appellant was found guilty as charged. The jury did find, however, that appellee failed to prove appellant had a firearm on or about his person while committing the offenses, and appellant was thus cleared of all four firearm specifications. The trial court convicted appellant of both R.V.O. specifications. The trial court continued the matter for sentencing. Appellant appeared for sentencing and the trial court imposed a total aggregate prison term of 20 years.

{¶28} Appellant now appeals from the judgment entry of his convictions and sentence.

{¶29} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶30} "I.   PROSECUTORIAL MISCONDUCT DENIED MR. HODGE A FAIR TRIAL AND DUE PROCESS OF LAW, IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATE CONSTITUTION, ARTICLE I, SECTIONS 10 AND 16, OF THE OHIO CONSITUTION."

{¶31} "II.  MR. HODGE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

{¶32} "III.  THE TRIAL COURT'S RESTITUTION ORDER FOR $184,900 WAS NOT ADEQUATELY SUPPORTED BY THE RECORD."

**ANALYSIS**

I.

{¶33} In his first assignment of error, appellant argues prosecutorial misconduct deprived him of a fair trial.  We disagree.

{¶34} The test for prosecutorial misconduct is whether the prosecutor's remarks and comments were improper and if so, whether those remarks and comments prejudicially affected the substantial rights of the accused. *State v. Lott,* 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990), cert. denied, 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596 (1990). In reviewing allegations of prosecutorial misconduct, we must review the complained-of conduct in the context of the entire trial. *Darden v. Wainwright,* 477 U.S. 168, 184, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived appellant

of a fair trial based on the entire record. *Lott,* supra, 51 Ohio St.3d at 166, 555 N.E.2d 293. Appellant points to a number of instances of alleged prosecutorial misconduct and argues that the cumulative effect of these examples deprived him of a fair trial.

{¶35} Appellant cites a number of instances of alleged prosecutorial misconduct during opening statement, closing argument, and direct examination of Thomas. We note appellant did not object to the alleged improper comments at trial. If trial counsel fails to object to the alleged instances of prosecutorial misconduct, the alleged improprieties are waived, absent plain error. *State v. White,* 82 Ohio St.3d 16, 22, 1998–Ohio–363, 693 N.E.2d 772 (1998), citing *State v. Slagle,* 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992).

{¶36} We therefore review appellant's allegations under the plain-error standard. Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The rule places several limitations on a reviewing court's determination to correct an error despite the absence of timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes "an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn,* 5th Dist. No.2008–CA–00137, 2009–Ohio–1688, citing *State v. Morales,* 10 Dist. Nos. 03-AP-318, 03-AP-319, 2004-Ohio-3391, at ¶ 19. The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶37} First, appellant argues the prosecutor undermined the presumption of innocence in opening statement with the assertion that "just because we are down here and having a trial does not mean that there is a great big mystery to solve," a comment that was repeated in closing argument. We disagree with appellant's characterization and find the comment to be innocuous in the context of the entire opening statement and closing argument. Appellant further argues the prosecutor vouched for Thomas' credibility by reminding the jury that Moorehead found Thomas to be a truthful person, and inflamed the jury with reference to appellant's "outrageous conduct." In the context of the trial as a whole, we find appellant's argument to be overstating the import of these comments. The prosecutor's statements were also accurate summaries of the evidence.

{¶38} Appellant fails to point to any improper statement by the prosecutor which is not arguably supported by appellee's evidence. *State v. Meeks*, 5th Dist. No. 2014CA00017, 2015-Ohio-1527, 34 N.E.3d 382, ¶ 103. In closing argument, a prosecutor may comment on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *Id.*, citing S*tate v. Lott,* 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). Appellant argues the prosecutor vouched for Thomas' credibility during her direct examination but we again disagree with his characterizations of the record. Upon our review, we find the cited comments to be reasonable inferences from the evidence.

{¶39} Finally, appellant has failed to demonstrate prejudice based upon any of the prosecutor's comments he cites. "Appellant does not identify any connection between the alleged misconduct and his conviction. * * * *. [T]he trial court clearly believed, and the record reflects, that the prosecutor's theory of the case was relevant as to certain issues.

Appellant's pure speculation as to how the jury might overreact to this evidence is not the kind of 'but for' argument that will support a finding of misconduct." *Meeks*, supra, 2015-Ohio-1527 at ¶ 105, citing *State v. Carmichael,* 7th Dist. Columbiana No. 11 CO 23, 2013-Ohio-2178, 2013 WL 2325849, ¶ 14. None of the evidence or arguments cited by appellant are improper, and appellant cannot demonstrate, even if they were improper, "but for" the evidence and arguments he would not have been convicted. Having failed to demonstrate a causal connection between the alleged misconduct and his resulting convictions, appellant cannot demonstrate reversible error.

{¶40} If a prosecutor's comments are found to be improper, it is not enough that there is sufficient evidence to otherwise sustain a conviction. "Instead, it must be clear beyond a reasonable doubt that absent the prosecutor's comments, the jury would have found defendant guilty." *State v. Clay,* 181 Ohio App.3d 563, 2009–Ohio–1235, 910 N.E.2d 14 at ¶ 49 (8th Dist.), citing *State v. Smith,* 14 Ohio St.3d 13, 470 N.E.2d 883 (1984). Appellant cannot demonstrate, even if any of the cited comments were improper, "but for" the comments he would not have been convicted. Appellee presented substantial uncontroverted evidence of appellant's guilt. Having failed to demonstrate a causal connection between the alleged misconduct and his resulting convictions, therefore, appellant cannot demonstrate reversible error.

{¶41} Appellant's first assignment of error is overruled.

II.

{¶42} In his second assignment of error, appellant argues he received ineffective assistance of defense trial counsel.  We disagree.

{¶43} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶44} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶45} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶46} Appellant first asserts trial counsel was ineffective in failing to object to the cited instances of alleged prosecutorial misconduct.  Trial counsel's failure to object to the alleged misconduct could be reasonably interpreted as tactical decisions designed to not bring attention to what may or may not be objectionable matter, so we reject the assertion that the failure to object is evidence of ineffective assistance of counsel. *State v. Lawson*, 5th Dist. Morrow No. 17CA0008, 2018-Ohio-4673, ¶ 41, appeal not

allowed, 155 Ohio St.3d 1405, 2019-Ohio-944, 119 N.E.3d 433.  Because this appears to be a reasonable tactical decision we cannot convert it to a judicial error. *Id.,* citing *State v. Clayton*, 62 Ohio St.2d 45, 46–47, 402 N.E.2d 1189 (1980); *State v. Noggle*, 140 Ohio App.3d 733, 746, 749 N.E.2d 309 (3d Dist.2000), additional citations omitted.

{¶47} Next, appellant argues defense trial counsel was ineffective in failing to object to Moorehead's testimony as a "de facto expert witness."  Evid.R. 701 provides that a lay witness may provide opinion testimony where the witness's opinion is rationally based upon the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue.

{¶48} In the instant case, Moorehead's testimony about the authenticity of the deed, and the significance of the notebooks and legal encyclopedias left behind by appellant and his accomplice, were based upon his perceptions as a fact witness and Thomas' personal real-estate attorney who was involved in the eviction proceeding and was in a unique position to investigate the alleged sale of Thomas' residence.  His opinion was helpful in describing the significance of the legal materials found in the house and the recording of the deed.  Appellant does not assert upon what basis defense trial counsel should have objected to Moorehead's testimony.  Moreover, we find no reasonable probability that if counsel had objected to Moorehead's testimony, the result of the proceeding would have been different.

{¶49} Appellant has not established ineffective assistance of defense trial counsel.  The second assignment of error is overruled.

III.

{¶50} In his third assignment of error, appellant argues the trial court's restitution order was not adequately supported by the record.  For the following reasons, we agree, and therefore sustain this assignment of error.

{¶51} We review restitution orders under an abuse-of-discretion standard. *State v. Sheets*, 5th Dist. Licking No. 17 CA 44, 2018-Ohio-996, 2018 WL 1358039, ¶ 15, citing *State v. Cook*, 5th Dist. Fairfield No. 16-CA-28, 2017-Ohio-1503, 2017 WL 1436377, ¶ 8; *State v. Andrews,* 5th Dist. Delaware No. 15 CAA 12 0099, 2016-Ohio-7389, 2016 WL 6138888, ¶ 40. We also recently reiterated that an order of restitution must be supported by competent and credible evidence from which the trial court can discern the amount of restitution to a reasonable degree of certainty. *Sheets*, supra, citing *State v. Spencer*, 5th Dist. Delaware No. 16 CAA 04 0019, 2017-Ohio-59, 2017 WL 90619, ¶ 44 (citations omitted); *State v. Frank*, 5th Dist. No. CT2017-0102, 2018-Ohio-5148, 127 N.E.3d 363, ¶ 64. Furthermore, a trial court abuses its discretion if it orders restitution in an amount that does not bear a reasonable relationship to the actual loss suffered. *Id.* (citations omitted).

{¶52} At sentencing, appellant was summarily ordered to pay restitution in the amount of $184,900, and Thomas is designated as the payee of the restitution order in the sentencing entry.  Appellant asserts this restitution amount is not supported by competent, credible evidence in the record.  Appellee responds that Thomas provided "receipts and quotes" which the trial court reviewed, but we are unable to find evidence of this documentation in the record.  Appellee has attached the transcript of co-defendant Eblin's sentencing hearing at which the issue of restitution was addressed in considerably

more depth.   Eblin's sentencing hearing reveals that the trial court first rejected the requested restitution amount of $184,900, but then upon reconsideration ordered that amount because it was "attached to the presentence investigation [of Eblin]."  The P.S.I. in the instant case is not in the record before us, and the trial court did not reference the P.S.I. in ordering restitution, so we are unaware of what documentation may exist supporting the ordered amount.

{¶53} We are left with a void of competent, credible evidence supporting the restitution in the instant case, although such evidence may exist.  We are thus unable to determine whether the trial court abused its discretion in reconsidering the amount which it first deemed excessive.   We find insufficient evidence to support the $184,900 restitution order, grant appellant's third assignment of error, and remand this matter for a restitution hearing.  *State v. LaFever*, 5th Dist. Morrow No. 2009CA0003, 2009-Ohio-5471, ¶ 28.

{¶54} Appellant's third assignment of error is sustained, the restitution order is reversed and vacated, and the matter is remanded for a restitution hearing.

**CONCLUSION**

{¶55} Appellant's first and second assignments of error are overruled and his third assignment of error is sustained. The judgment of the Muskingum County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded for further proceedings.

By: Delaney, J.,

Wise, John, P.J. and

Wise, Earle, J., concur.