[Cite as *State v. Jones*, 2017-Ohio-8633.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Patricia A. Delaney, P. J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J.<br>Hon. John W. Wise, J. |
| -vs- | |
| | Case No. 2016 CA 0045 |
| AUSTIN JONES | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:     Criminal Appeal from the Court of Common
                            Pleas, Case No.  2015 CR 0970


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      November 17, 2017


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

GARY BISHOP                               WILLIAM T. CRAMER
PROSECUTING ATTORNEY                      470 Olde Worthington Road
JOSEPH C. SNYDER                          Suite 200
ASSISTANT PROSECUTOR                      Westerville, Ohio  43082
38 South Park Street
Mansfield, Ohio  44902

*Wise, J.*

{¶1}   Appellant Austin Jones appeals his conviction, in the Court of Common Pleas, Richland County, for murder, attempted murder, and other offenses. Appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.

{¶2}   On November 3, 2015, Cedric Daniels and Appellant Jones (aka "Julio") went to the American Legion on Harmon Avenue in Mansfield for "dollar shot night." Brianna Daniels eventually joined them. Brianna is Cedric's sister and was at that time appellant's girlfriend. Appellant often stayed overnight at Brianna's residence, but he did not reside there. According to Brianna, appellant made money by selling drugs and "getting checks." Tr. at 231. Brianna was also a customer in appellant's alleged drug sale activities. On the date in question, Brianna and appellant had already been consuming alcohol and cocaine, or as Brianna described it, "*** all throughout the night, and through the day, drinking and kicking it." Tr. at 233.

{¶3}   Kelsey Leonhard, an acquaintance who occasionally provided transportation services in exchange for cash or drugs, gave everyone rides that night and functioned as the designated driver.

{¶4}   Rena Daniels, Brianna and Cedric's maternal aunt, was the bar and kitchen manager at the American Legion. She observed that appellant was "drinking pretty fast that night." Tr. at 184. She testified that she was a former user of cocaine, and that she thought his rapid drinking was a result of him being high on something. At some point in the evening, someone informed her that appellant and Brianna were arguing out on the dance floor; however, they eventually left the bar.

**{¶5}** The aforesaid argument, apparently caused by appellant buying a drink for a female customer, carried over into the gravel parking lot. According to Brianna, appellant felt he had been disrespected, so he choked her and "slammed" her to the ground, causing abrasion injuries to her hand and knee. Tr. at 237-240.

**{¶6}** Brianna's cousin, Travis "Terrell" Daniels, happened to be in the area. He saw something was wrong and ran over to see what was happening. It looked to him like appellant was trying to get Brianna back into the car, but he did not see appellant trying to choke her or throw her down. Appellant, not realizing who Travis was, then angrily went to the car the group was using that night and retrieved a pistol. Appellant then stumbled and fell to the ground, but got back on his feet. Travis then jumped for cover into a friend's van. After Travis got in the van, appellant pointed what appeared to him to be a gun at the vehicle. The van was then driven from the scene.

**{¶7}** Brianna and Cedric managed to get appellant temporarily calmed down. Appellant began crying and apologizing. Brianna decided to leave the area with appellant, as she believed that it would help to keep things peaceable. Appellant, Brianna, Cedric, and Kelsey then left together to go to Brianna's house on Cleveland Avenue.

**{¶8}** The arguing resumed during the trip home. At some point, Brianna got out of the car and threatened to walk the rest of the way, but she got back in and the trip continued.

**{¶9}** When appellant, Brianna, Cedric, and Kelsey arrived at the residence, Brianna's two children and her mother were there. Also present were Tyrique Nettles and Qadree Gray, two adult relatives of Brianna's children. When Brianna got out of the car, she observed her cousin Lacey and a friend sitting in another vehicle parked near the

house. An argument briefly resulted between Lacey and appellant, so Lacey and her friend left the premises. Brianna entered the house, got into another argument with her mother, and then went outside to cool off. After Cedric spoke with his mother and told her he would handle the situation, appellant's mother left for the evening.

{¶10} When Brianna re-entered the house, she went upstairs, the layout of which consisted of a bathroom, Brianna's bedroom, Cedric's bedroom (which included an older-model television set), and the bedroom for Brianna's two children. One of the children was already trying to go to sleep, while the other was with Qadree and Tyrique, watching a basketball game in Cedric's room. Meanwhile, the arguing between Brianna and appellant resumed upstairs in her bedroom. After Brianna closed the door, appellant started demanding money from her. He also punched her several times, leaving a lump on her face. According to Brianna, appellant then retrieved a gun from his orange and black book bag. Appellant also began cussing at Brianna, so she commenced running out of the bedroom, toward the children's bedroom. As she ran, appellant opened fire and struck her with a bullet that entered her back, causing a lung contusion. As the fracas spilled into the hallway, appellant continued firing, hitting Cedric with two rounds to the chest.

{¶11} As Brianna tried to get away, appellant yelled: "Bitch, you disrespect me." Tr. at 259. Appellant caught her after she got to the children's bedroom and dragged her back to her bedroom, past the spot where Cedric was lying on the ground. *Id.* Once they were back in the room, appellant started choking Brianna against the wall, telling her: "Bitch, you going to die tonight." Tr. at 259. Eventually, Brianna lost consciousness from the choking.

{¶12} When the shots commenced, Qadree (the brother of the father of Brianna's children) and Tyrique (Qadree's cousin) did their best to shield Brianna's children. They thereafter saw appellant packing two bags. Appellant then exited the house with at least one bag. Qadree and Tyrique each called 911.

{¶13} Officers from the Mansfield Police Department and other law enforcement agencies soon arrived at the house. Brianna, who had regained consciousness, came outside to the officers, yelling for help. Cedric was found lying partially in the hallway on the second floor. Two bullets and one shell casing were discovered on the second floor and submitted for testing. Brianna's bedroom was in disarray and her blood was in various parts of the room. The witnesses believed there had been four shots and thought the shooter's name was "Julio" (appellant's nickname). Tr. at 131. Brianna told police that the shooter was named Austin. Tr. at 231-232. He was described as a tall and thin black male with braids.

{¶14} Cedric was transported to the hospital, where he was pronounced dead as a result of two gunshot wounds to the chest. Brianna Daniels was also treated for a gunshot wound to the back. She also had a wound on the back of her arm and an abrasion on her hand.

{¶15} Chief Medical Examiner Dr. Lisa Kohler from Summit County performed an autopsy on Cedric Daniels on November 5, 2015. There were two gunshot wounds on the right side of his chest. There were entrance and exit wounds. She determined that "we don't have any characteristics that indicate the weapon was held close to the individual at the time it was fired." Tr. at 512. Also, the wounds did not indicate that they

were caused by ricocheting, and Cedric had no defensive wounds that would suggest an altercation or physical struggle prior to being shot. Tr. at 514-515.

{¶16} The day after the shooting, police officers returned to the area to search for additional evidence. Officers found a vacant house near the scene of the shooting and proceeded to search it. Inside a closet in the vacant house, officers found appellant's orange book bag and black duffle bag, which contained his clothing.

{¶17} When appellant had started shooting, Kelsey (the designated driver that night) jumped out of a second-floor window. While Kelsey was outside of the house after jumping, she saw appellant running down an alleyway with an orange backpack. Later, while Kelsey was at the police station, a call came in on her cell phone from appellant's number. She was too afraid to answer, but officers requested that she text appellant instead. In one of the text messages, appellant offered Kelsey $100.00 and extra gas money or drugs if she would pick him up in Columbus and drive him to Indiana. Officers then arranged for Kelsey to pick appellant up in an unmarked police vehicle. When appellant came out of the house at the Columbus location, officers arrested him. He had no observable wounds on or about his body.

{¶18} Police officers made contact with appellant's parents and were able to ascertain a general area where the gun may have been hidden. While the police were searching alleyways near Brianna's residence, a concerned citizen told them about seeing someone run up to his house on the night of the murder. Police then examined the adjacent house and discovered some vinyl siding leaning up against a wall. They found the gun at this spot, a "45 Kahr" semi-automatic. The gun was loaded with one round in the chamber, and there were two rounds in the magazine. The maximum number

of rounds the gun could hold in the magazine is six. Test fires of appellant's gun revealed that the casing found at the crime scene matched the weapon.

{¶19} Investigators also found pictures on appellant's phone of him wearing a baseball cap similar to the one recovered with appellant's orange backpack and duffle bag, and holding a firearm similar to the one tied to the shooting.

{¶20} On December 18, 2015, appellant was indicted by the Richland County Grand Jury for murder, attempted murder, two counts of felonious assault, and having a weapon under a disability. The matter proceeded to a jury trial conducted on June 16 through 22, 2016. The State presented twenty-three witnesses, including Brianna, Kelsey, Qadree, Tyrique, Travis, and Rena. Appellant, advancing a theory of self-defense, took the stand as the sole defense witness, as further discussed *infra*. The jury was given a self-defense instruction by the trial court. Tr. at 807-810. The court also permitted a jury view of the premises on Cleveland Avenue. *See* Tr. at 195.

{¶21} After hearing the evidence and arguments, the jury convicted appellant of the following: (1) the murder of Cedric Daniels, R.C. 2903.02(A), an unclassified felony; (2) the attempted murder of Brianna Daniels, R.C. 2923.02(A) and R.C. 2903.02(A), a first-degree felony; (3) felonious assault with a deadly weapon against Brianna Daniels, R.C. 2903.11(A)(2), a second-degree felony; (4) felonious assault causing serious physical harm against Brianna Daniels in violation of R.C. 2903.11(A)(1), a second-degree felony; and (5) having a weapon while under disability in violation of R.C. 2923.13(A)(1), a third-degree felony. Additionally, the jury found that the prosecution had proven a firearm-use specification under R.C. 2941.145 as to murder, attempted murder, and assault with a deadly weapon. Tr. at 875-876.

**{¶22}** At sentencing, the court merged the felonious assault counts into the attempted murder count under R.C. 2941.25. The court then imposed a mandatory prison term of fifteen years to life for murder, seven years in prison for attempted murder, to be served consecutively, and three years in prison for having a weapon under disability, to be served concurrently. Finally, the court imposed six years of mandatory consecutive prison time for two of the firearm use specifications as set forth in R.C. 2929.14(B)(1)(g). Appellant thus received an aggregate sentence of twenty-one years to life with an additional seven years.

**{¶23}** On July 15, 2016, appellant filed a notice of appeal.

**{¶24}** On March 17, 2017, this Court granted original appellate counsel's motion to withdraw and ordered the trial court to appoint new appellate counsel. The trial court accomplished same on March 24, 2017.

**{¶25}** Appellant herein raises the following four Assignments of Error:

**{¶26}** "I.  THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS UNDER THE STATE AND FEDERAL CONSTITUTIONS, AND EVID.R. 901(A), BY REFUSING TO EXCLUDE BULLETS AND CASINGS AFTER A CRIME LAB EXPERT PLACED THEM IN THE WRONG EVIDENCE BAGS.

**{¶27}** "II.  THE JURY ERRED IN FINDING APPELLANT GUILTY OF MURDER BECAUSE THE GREATER WEIGHT OF THE EVIDENCE SUPPORTED APPELLANT'S CLAIM OF SELF-DEFENSE.

**{¶28}** "III.  APPELLANT'S STATE AND FEDERAL RIGHTS TO DUE PROCESS WERE VIOLATED WHEN THE JURY FOUND HIM GUILTY OF ATTEMPTED MURDER BASED ON INSUFFICIENT EVIDENCE OF A SPECIFIC INTENT TO KILL.

**{¶29}** "IV.   THE JURY ERRED IN FINDING APPELLANT GUILTY OF ATTEMPTED MURDER BECAUSE THE WEIGHT OF THE EVIDENCE DID NOT SUPPORT A FINDING THAT HE SPECIFICALLY INTENDED TO KILL."

I.

**{¶30}** In his First Assignment of Error, appellant contends the trial court erred in admitting certain physical evidence provided by the State's expert witnesses. We disagree.

**{¶31}** The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 180, 510 N.E.2d 343. As a general rule, all relevant evidence is admissible. Evid.R. 402; cf. Evid.R. 802. Our task is to look at the totality of the circumstances in the case *sub judice*, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing or excluding the disputed evidence. *State v. Oman*, 5th Dist. Stark No. 1999CA00027, 2000 WL 222190.

**{¶32}** In demonstrating a chain of custody, "[t]he proponent of the evidence need not offer conclusive evidence as a foundation but must offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury." *State v. Harold,* 11th Dist. Portage No. 2014–P–0012, 2015-Ohio-954, 2015 WL 1142946, ¶ 37, citing *State v. Ewing,* 9th Dist. Lorain No. 97CA006944, 1999 WL 241610.

**{¶33}** During the trial in the case *sub judice*, the State called Dawn Fryback, a DNA analyst with the police department's crime lab. During her testimony, she noted that just prior to trial she had observed that a clear plastic bag marked Exhibit 13-C contained a bullet, but the bag did not have her initials on it. Concerned, she had then discovered

that a manila envelope labelled Exhibit 32 felt like it contained a shell casing instead of a bullet, even though her report indicated that said envelope was supposed to contain a bullet. Because the plastic bag (13-C) and envelope (32) were both transferred to the Ohio BCI for ballistics testing and comparison, Fryback speculated that at some point the bullet and casing had been switched in their respective receptacles. *See* Tr. at 471-472.

{¶34} The State also called Andrew McClelland, a firearms expert from BCI. He also stated that a bullet and casing had been switched. However, because McClelland market the bullets and casings when he evaluated them, he believed he could identify where they were supposed to go. He also testified that the bullet found in Exhibit 13-C should have been in the envelope marked Exhibit 32, and the casing from 32 should have been in the plastic bag marked 13-C. Tr. at 550-555. McClelland, upon further inspection, then stated he "got out of sequence" when he had handled several exhibits. Tr. at 560.

{¶35} Appellant urges that the aforesaid cannot be classified as harmless error, maintaining that the evidence presented against him was not overwhelming. Ultimately, however, the record reveals the witnesses fully articulated the nature of the receptacle mix-up to the jury, and as the State accurately responds in its brief, in this instance nothing in the record leads to the conclusion that the bullets and casing presented as evidence were not the actual items found at the scene, nor was the ability of BCI or law enforcement personnel to conduct their examination impacted. In addition, as further discussed infra, appellant presented a self-defense theory, and appellant did not deny being the shooter. Upon review, we find appellant suffered no prejudice as a result of the switching error, and any issues with the chain of custody would have only impacted the weight of the

bullet/casing evidence, not its admissibility. *See State v. Semedo,* 5th Dist. Stark No. 2006 CA 00108, 2007-Ohio-1805, ¶ 12.

**{¶36}** The trial court therefore did not abuse its discretion in permitting the testimony of Ms. Fryback and Mr. McClelland. Appellant's First Assignment of Error is overruled.

II.

**{¶37}** In his Second Assignment of Error, appellant contends his conviction for the murder of Cedric Daniels, particularly concerning the jury's rejection of self-defense, was against the "greater weight of the evidence." We disagree.

*Standard of Appellate Review*

**{¶38}** As an initial matter, we note appellant has set forth both the "sufficiency of the evidence" standard and the "manifest weight" standard as to this assigned error, although he ultimately posits that the latter is proper under the circumstances. *See* Appellant's Brief at 22.

**{¶39}** It is well-established that self-defense is a "confession and avoidance" affirmative defense in which the defendant admits the elements of the crime but seeks to prove some additional element which absolves the defendant of guilt. *See Uhrichsville v. Losey,* 5th Dist. Tuscarawas No. 2005 AP 03 0028, 2005–Ohio–6564, ¶ 9. We thus initially agree with appellant that a review for sufficiency of the evidence is not preferable in the present argument because the defense of self-defense does not involve the substantive elements of murder. *See State v. Harrison*, 10th Dist. Franklin No. 06AP-827, 2007-Ohio-2872, ¶ 23. *See, also, State v. Jennings,* 10th Dist. Franklin No. 05AP-1051, 2006-Ohio-3704, ¶ 28. In other words, "*** when reviewing a claim by a defendant that

evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability. *State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685 (8th Dist.), ¶ 18, citing *Cleveland v. Williams,* 8th Dist. Cuyahoga No. 81369, 2003-Ohio-31, ¶ 10. *See*, *also*, *State v. Nichols*, 5th Dist. Richland No. 12 CA 102, 2013-Ohio-3898, ¶ 20.

{¶40} Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. *See*, *also*, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175, 485 N.E.2d 717. Even though a manifest weight analysis may involve an appellate court's consideration of credibility (*see State v. Sanders*, 76 N.E.3d 468, 2016–Ohio–7204 (5th Dist.), ¶ 38), the weight to be given to the evidence and the credibility of the witnesses are primarily issues for the trier of fact (*see, e.g., State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180).

*Self-Defense Overview*

{¶41} Self-defense is an affirmative defense that legally excuses admitted criminal conduct. *State v. Edwards*, 1st Dist. Hamilton No. C–110773, 2013-Ohio-239, ¶ 5, citing *State v. Poole,* 33 Ohio St.2d 18, 19, 294 N.E.2d 888 (1973). The affirmative defense of

self-defense places the burden of proof on a defendant by a preponderance of the evidence. *In re Collier,* 5th Dist. Richland No. 01 CA 5, 2001 WL 1011457, citing *State v. Caldwell,* 79 Ohio App.3d 667, 679, 607 N.E.2d 1096.

**{¶42}** To establish self-defense through the use of deadly force, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Keil*, 5th Dist. Richland No. 16CA28, 2017-Ohio-593, ¶ 40, citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002–Ohio–68, 759 N.E.2d 1240 (additional citation and internal quotations omitted). If the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense. *Id*., citing *State v. Jackson,* 22 Ohio St.3d 281, 284, 490 N.E.2d 893(1986).

## *Analysis*

**{¶43}** Appellant urges that via his own trial testimony, he established all three necessary elements of self-defense. *See Keil*, *supra*. He points out the evidence consistently showed that he and Cedric had generally been on good terms prior to the shooting, suggesting that he had no reason to harm Cedric other than self-defense. As previously iterated, Brianna claimed that appellant was attacking her. She testified that while they were arguing in her bedroom, appellant hit her, and then shot at her as she

fled.[1] When she ran out into the hallway, appellant followed her and shot at her again, striking Cedric, who was standing in the hallway. Brianna summarized as follows during cross-examination:

**{¶44}** "Q. And during the State's examination I also understood you to say, and you correct me if I'm wrong at all, that Cedric was standing in the hallway and was shot twice in the chest?

**{¶45}** "A. He was in the hallway, had got shot. I'm not honestly sure how many gunshot wounds there was. I know he was popping off. And my brother got shot. I thought he got shot twice, to tell you the truth, because he was firing.

**{¶46}** "Q. So you felt as though Austin was shooting at you, but - -

**{¶47}** "A. Killed my brother.

**{¶48}** "Q. - - missed and hit your brother in the hallway - -

**{¶49}** "A. He didn't miss me, but he was still trying to shoot me more and he shot and killed my brother.

**{¶50}** "Q. And he was standing in your bedroom doorway?

**{¶51}** "A. No, he was in the hallway. By the time he stepped out my bedroom door (indicating), my brother was just like coming out the kids' room, but as he's shooting, my brother was just walking.

**{¶52}** "Q. And he fell backward?

**{¶53}** "A. He said he shot me, he just shot me, and fell back."

**{¶54}** Tr. at 306-307.

---

[1] Brianna's testimony is somewhat confusing on the question of her exact locale when she was struck by gunfire. *See* Tr. at 252-253; 305-306.

**{¶55}** Appellant contends Brianna's version of events is not credible because it is contradicted by the physical evidence and eyewitness testimony. Although she had some abrasions on her hands and one near her eye, she did not have any marks on her neck that would be consistent with being choked into unconsciousness. Appellant urges that the physical evidence and witness testimony demonstrated that Cedric was shot in the children's bedroom and fell into the hallway, as opposed to being shot in the hallway from Brianna's bedroom. For example, he notes bullet holes were found in the walls of the children's room, not in Brianna's room. In a similar vein, bullet casings were found in the children's bedroom and downstairs, but not in Brianna's bedroom.

**{¶56}** As to the first self-defense element, *i.e.*, whether appellant was at fault in creating the violent situation, appellant testified that Brianna was angry with him at the house and was throwing things around her room. Appellant asserted that as he grabbed her to try to calm her down, she falsely yelled that he was hurting her. He points out that she argued with a number of people that night, including her own mother and two women who were merely sitting in a car outside her house, and nobody seemed able to calm her down. Appellant maintains that Cedric became aggressive and attacked him before he could explain what was going on.

**{¶57}** Regarding the second self-defense element, *i.e.*, whether appellant had a bona fide belief that he was in imminent danger of death or great bodily harm, and the third element, *i.e.*, the duty to retreat , we again note appellant's version of the altercation was that Cedric came in with a gun after hearing Brianna exclaim that appellant was hitting her. Appellant's explanation for Cedric possessing a gun was that Cedric had asked appellant earlier that night to let him secure it due to the arguing in the house.

Appellant claimed at trial that even after he ended up in the children's bedroom, Cedric aggressively approached him, and he effectively had nowhere else to go, as the event occurred on the second floor.

**{¶58}** Appellant's present argument is contingent on his assertion that he was the only credible witness at trial whose testimony matches the physical evidence supporting the claim of self-defense. However, we find the record supports the jury's decision. For example, Qadree testified that Cedric did not generally resort to violence and had never been known to possess a gun. *See* Tr. at 334. Brianna's cousin Travis had seen appellant, earlier on the night in question, acting in a threatening manner outside the American Legion with what appeared to be a gun. Furthermore, the chief medical examiner determined that there was no indication that Cedric was shot at close range, and the wounds did not indicate that they were caused by a ricochet. Tr. at 512-514. She also observed that Cedric had no defensive wounds that one would usually get from being in a fight. Tr. at 515. None of the other witnesses testified to the existence of a physical struggle between appellant and Cedric. In addition, appellant left the scene of the shooting, attempted to hide his gun, and had already fled to Columbus and was trying to get to another state when he was apprehended.

**{¶59}** We have frequently recognized that the jurors in a criminal trial "as the firsthand triers of fact, [are] patently in the best position to gauge the truth." *See, e.g., State v. Frazier,* 5th Dist. Stark No. 2010CA00042, 2011–Ohio–434, ¶ 23. Furthermore, while a jury may take note of inconsistencies and resolve or discount them accordingly, such inconsistencies do not render a defendant's conviction against the manifest weight

of the evidence. *See State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752, *citing State v. Nivens,* 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714.

**{¶60}** Upon review, we find the jury, in rejecting appellant's theory of self-defense after hearing the evidence and being taken to view the house where the shooting took place, did not clearly lose its way and create a manifest miscarriage of justice requiring that appellant's conviction for the murder of Cedric Daniels be reversed and a new trial ordered.

**{¶61}** Appellant's Second Assignment of Error is overruled.

III.

**{¶62}** In his Third Assignment of Error, appellant contends his conviction for the attempted murder of Brianna was not supported by sufficient evidence, specifically as to the issue of intent. We disagree.

**{¶63}** In appellate review of a sufficiency of the evidence claim, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶64}** The elements of attempted murder are set forth in the Ohio Revised Code as follows: R.C. 2903.02(A), the murder statute, provides that "[n]o person shall purposely cause the death of another * * *." R.C. 2923.02(A), the "attempt" statute, provides that "no person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would

constitute or result in the offense." *See State v. Majid*, 8th Dist. Cuyahoga No. 96855, 2012-Ohio-1192, ¶ 19.

**{¶65}** Under Ohio law, the trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death. *See State v. Turner*, 10th Dist. Franklin No. 97APA05-709, 1997 WL 798770, citing *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus. Furthermore, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Brown,* 8th Dist*.* Cuyahoga No. 68761, 1996 WL 86627 (additional citations omitted).

**{¶66}** In the case *sub judice*, upon review of the record and transcript in a light most favorable to the prosecution, we find that a reasonable finder of fact could have found beyond a reasonable doubt that appellant purposely attempted to cause the death of Brianna via his acts of firing the weapon during the events in question.

**{¶67}** Appellant's Third Assignment of Error is overruled.

IV.

**{¶68}** In his Fourth Assignment of Error, appellant contends his conviction for the attempted murder of Brianna was against the manifest weight of the evidence. We disagree.

**{¶69}** Appellant, even though he did not dispute being the shooter in his trial testimony, presently urges that the only eyewitness testimony concerning the act of

attempted murder came from Brianna and Qadree. Appellant proposes that Brianna simply was "likely struck by a stray bullet." Appellant's Brief at 26.[2]

**{¶70}** As noted previously herein, Brianna essentially testified that appellant shot her in the back in or as she ran from her bedroom, and he thereupon shot Cedric with additional rounds. Qadree testified that while he was watching a televised basketball game in Cedric's bedroom, he heard the first shots and then saw appellant "wild firing" in the children's bedroom (Tr. at 328); however, his statement to the police suggested he did not look out of Cedric's bedroom until the firing had stopped. Tr. at 346. While appellant characterizes Brianna's testimony as untrustworthy and Qadree's testimony as "contradictory and self-aggrandizing" (Appellant's Brief at 25, 26), upon review under the standard of *Martin*, *supra*, we find the jury did not clearly lose its way and create a manifest miscarriage of justice requiring that appellant's conviction for the attempted murder of Brianna be reversed and a new trial ordered.

---

[2] In our assessment, some of appellant's arguments going to manifest weight are placed in his section on sufficiency of the evidence, and we review them at this juncture in the interest of judicial economy.

**{¶71}** Appellant's Fourth Assignment of Error is overruled.

**{¶72}** For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Richland County, Ohio, is hereby affirmed.


By: Wise, J.

Delaney, P. J., and

Hoffman, J., concur.


JWW/d 1025