[Cite as *State v. Cunningham*, 2022-Ohio-3982.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2022 CA 00008 |
| | : | |
| BRYAN CUNNINGHAM | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:         Appeal from the Fairfield County
                                                         Municipal Court, Case No. CRB2101497

JUDGMENT:                                       AFFIRMED

DATE OF JUDGMENT ENTRY:         November 7, 2022

APPEARANCES:

For Plaintiff-Appellee:                          For Defendant-Appellant:

JOSEPH M. SABO                              STEPHEN T. WOLFE
ASSISTANT PROSECUTOR               WOLFE LAW GROUP, LLC
CITY OF LANCASTER                        1350 W. 5th Ave., Suite 330
136 West Main St., P.O. Box 1008      Columbus, OH 43212
Lancaster, OH 43130

*Delaney, J.*

{¶1} Defendant-Appellant Bryan Cunningham appeals his March 9, 2022 conviction and sentence by the Fairfield County Municipal Court.

## FACTS AND PROCEDURAL HISTORY

{¶2} On November 16, 2021, Deputy Logan Waite of the Fairfield County Sheriff's Office, filed complaints in the Fairfield County Municipal Court against Defendant-Appellant Bryan Cunningham alleging: (A) Aggravated Menacing, a first- degree misdemeanor in violation of R.C. 2903.21; (B) Aggravated Menacing, a first- degree misdemeanor in violation of R.C. 2903.21; (C) Domestic Violence, a first-degree misdemeanor in violation of R.C. 2919.25(A); (D) Domestic Violence Threats, a fourth-degree misdemeanor in violation of R.C. 2919.25(C); (E) Domestic Violence Threats, a fourth-degree misdemeanor in violation of R.C. 2919.25(C); (F) Endangering Children, a first-degree misdemeanor in violation of R.C. 2919.22(A); (G) Endangering Children, a first-degree misdemeanor in violation of R.C. 2919.22(A); (H) Endangering Children, a first-degree misdemeanor in violation of R.C. 2919.22(A); and (I) Endangering Children, a first-degree misdemeanor in violation of R.C. 2919.22(A).

{¶3} Cunningham entered not guilty pleas to the charges. The matter proceeded to a jury trial on February 17, 2021 and February 18, 2021, where the following facts were adduced.

### The Stepchildren's Testimony: An Argument Escalates

{¶4} On November 15, 2021, Cunningham resided in Rushville, Ohio, with his Wife, 13-year-old Stepdaughter, 12-year-old Stepson, 6-year-old biological daughter, and 5-year-old biological daughter. The custody arrangement for Stepdaughter and Stepson

was alternating weeks at Cunningham and Wife's home and biological father's home. At Wife's home, the children testified they had more rules and chores to do than at their biological father's home. Stepson and Stepdaughter testified that every day, Cunningham wore a fixed blade bowie knife and a gun strapped to his waist. Cunningham has a concealed carry permit.

{¶5} On November 15, 2021, Cunningham was at home with the younger children when Stepdaughter and Stepson got home from middle school. Cunningham and Stepdaughter got into a verbal argument about her friend's choice of pronouns. Wife returned home from work while Cunningham and Stepdaughter were still arguing, so Wife intervened. Cunningham told Stepdaughter and Stepson to carry sheets of drywall from the basement to the main floor, as he was in process of renovating the home, while Wife and Cunningham went into the laundry room.

{¶6} Stepdaughter and Stepson both testified that as they were carrying the drywall up from the basement, they heard Cunningham and Wife arguing in the laundry room and then the kitchen. They saw Cunningham push Wife in the chest and Wife fall after he pushed her. Cunningham ripped a kitchen cabinet door off the hinges and threw it. At one point, both Stepdaughter and Stepson testified they saw Cunningham grab Wife's throat with one hand and put a knife to her throat with the other hand. Stepdaughter believed Cunningham used his bowie knife; Stepson believed Cunningham used a kitchen knife. Stepson heard his mother yelp when Cunningham put the knife to her throat. While Stepson was in the basement, he texted his biological father at 6:04 p.m. He did not call the police himself because he was afraid that Cunningham would hear him, take his cell phone, and become more violent. Cunningham had already taken Wife and

Stepdaughter's cell phones and Wife's car keys. The following is the text exchange between Stepson and his biological father:

Stepson:

He just threatened mom with acknife [sic]

Very up close

Like he was going to stab jer [sic]

Also don't respond I think he might take my phone just call the police

or something I don't care

He's abusing her at this point

He's pushing her and cornering her

Call the police

Biological Father:

I can't do anything buddy. You would have to decide how serious it

is and call yourself.

Stepson:

[Rushville home address]

(State's Ex. A).

{¶7} Despite biological father's reluctance to call the police after his son's plea for help, biological father called 911 at 6:29 p.m. Sergeant Christopher Walker and Deputy Logan Waite of the Fairfield County Sheriff's Office were dispatched to the Rushville address on a reported call of domestic violence.

{¶8} Stepdaughter and Stepson had finished carrying the drywall up from the basement while Wife and Cunningham continued arguing. Stepdaughter testified she

intervened and told Wife to stop arguing because she did not want Cunningham to hurt her. Stepdaughter testified,

A. * * *I think at this point [Cunningham] pulled the gun out from the behind of his belt or I'm not completely sure of this, but it looked as to [Stepson], he said it looked like he did and that's what it felt like into my head, so –

Q. When you say that's what it felt like, what do you mean?

A. It just – it just actually kind of felt like metal gun, just not fingers.

Q. Okay. How certain are you that it wasn't his fingers?

A. Like 70 or 80 percent sure.

Q. Did he say anything to you when this happened?

A. Yeah, he was kind of just screaming. He was calling me names and telling me to pull the trigger, go die, I think. Yeah.

Q. What names was he calling you?

A. The B word, I think. The F slur. * * *

Q. And then you said, what else did he say about pulling the trigger?

A. Yeah, was like pull the trigger or something as if I was going to off myself.

* * *

Q. And when this incident with the gun happens, were you scared?

A. Yes.

Q. Why were you scared?

A. Because I felt like my life was being threatened.

(T. 131-133).

{¶9} Stepson testified that he saw his sister standing in the living room, but he did not see Cunningham with a gun. Stepdaughter told him that she thought he pulled his gun out of his holster and aimed it at her head. He heard Cunningham say, "something like why don't you go kill yourself, you emo." (T. 80-81). Stepson said his 6-year-old sister and Wife were present when this happened.

{¶10} After the gun incident, Stepdaughter testified that Cunningham fed the younger children dinner and Wife went upstairs to take a shower. She recalled Cunningham telling her younger siblings that he did not hold a gun to Stepdaughter's head. Then the police arrived.

### Fairfield County Sheriff's Office Investigation

{¶11} Sergeant Walker and Deputy Waite arrived at the residence based on the reported call of a domestic dispute from biological father. Biological father told the 911 dispatcher there was a knife and the possibility of a firearm at the residence. Cunningham met the officers on the deck of the home. Sergeant Walker saw the knife strapped to Cunningham's waist, so he asked him to put his hands on his head and not to make any movements. Cunningham stated he was a taxpayer and did not immediately follow the officers' orders, so Sergeant Walker drew his taser and pointed it at Cunningham's chest. Cunningham then complied. Sergeant Walker removed the knife and then discovered a gun tucked into the waist of his pants. The black Sig Sauer P365 was determined to be loaded with a bullet in the chamber and fully functional. Deputy Waite secured the knife and gun in his cruiser. Cunningham was handcuffed and seated on the outside deck.

{¶12} Sergeant Walker entered the residence through the kitchen. He observed a shotgun in a bedroom. When he spoke with Wife in the upstairs master bedroom, she told

him that she was okay but she appeared scared to him because her hands were noticeably shaking and her voice quivered. Sergeant Walker had to leave for another call and Deputy Waite was in charge of the scene. As he left, he told Deputy Waite that Wife appeared to be in fear.

{¶13} Deputy Waite was wearing a body cam on November 15, 2021, and his interactions with Cunningham and the family were recorded. The State presented the body cam videos to the jury. Deputy Waite initially spoke with Cunningham, and it appeared to the officer that Cunningham expected to be arrested. Cunningham said he knew where this was going and to just put in him the cruiser. He explained the argument with Stepdaughter and Wife, but he denied placing his hands-on Wife. He admitted to breaking a cabinet. Deputy Waite testified that he was confused as to why Cunningham felt he was going to be arrested, but he had not spoken to Wife or the children yet.

{¶14} After speaking with Cunningham, Deputy Waite spoke with Wife alone on the front porch at 6:57 p.m. The children were upstairs. The body cam recording of Deputy Waite's first interaction with Wife was played for the jury in State's Exhibit N. (T. 305). In the video, Wife explained she came home to Cunningham arguing with the kids about a transgender friend. Deputy Waite asked Wife if she was afraid for her life, and she said no. She denied there was anything physical. It was a heated argument where Cunningham threw some things and broke some things. Deputy Waite asked her if she was scared because she looked scared, and she responded, "I am." (T. 306). She was concerned that Cunningham would find out that Stepdaughter and Stepson called their father. Deputy Waite said Cunningham was told that a neighbor called the police. (T. 306). She said to Deputy Waite that Cunningham took her cards, keys, phone, and the kids'

phones, so she had nothing. Deputy Waite asked if Wife needed anything, and Wife said she would be fine.

{¶15} Deputy Waite spoke with Cunningham again. After he found out the neighbor had called the police, Deputy Waite testified that Cunningham plead the fifth.

{¶16} At 7:04 p.m., Deputy Waite went upstairs to speak with the children. State's Exhibit C, the body cam video of his discussion with the children, was played for the jury during Stepson's testimony. (T. 114). The video showed Stepson in a bedroom with the two younger siblings. Deputy Waite asked Stepson to show him the text messages he sent to his biological father, but Stepson said Cunningham had his phone. Stepdaughter came out into the hallway, where Stepson joined her. Deputy Waite testified the two children did not appear to be angry, but more concerned and nervous. In the body cam video, Deputy Waite asked if anything physical happened. Stepson told Deputy Waite that Cunningham was pushing "her," and he had "her" cornered in the laundry room. One of the younger siblings is seen in the video entering the hallway and standing behind Stepson. Deputy Waite asked the two older children if there was anything else. Stepson said that he threatened her with a knife. Stepson then told Deputy Waite that Cunningham held a gun to Stepdaughter's head, which Cunningham said was his fingers, but it was his gun. In the background, the younger sibling is seen pointing her fingers at her head and saying, "like this." Deputy Waite asked the Stepdaughter, "he had a gun and aimed it at you?" The younger sibling in the background said, "yeah, like this."

{¶17} Deputy Waite went back to the front porch to speak with Wife at 7:07 p.m. Her second statement to Deputy Waite was played for the jury in State's Exhibit D. (T. 313). In the video, Deputy Waite told Wife that the children said Cunningham pushed her,

put a knife to her throat, and took a gun out. Wife became visibly upset and began to cry. Deputy Waite asked Wife what happened, and Wife asked why it mattered what she said. She said he knew what happened. He asked her if what the kids said was true. She responded that she did not know what they said, but she was sure they were honest because she had honest kids. Deputy Waite testified that Wife did not deny what happened in the house that evening but would not tell Deputy Waite what happened. Wife told Deputy Waite that she did not want Cunningham to be arrested and charged for his alleged actions on November 15, 2021.

{¶18} Deputy Waite testified he arrested Cunningham based on the children's statements and the totality of the circumstances of his interactions with Cunningham, the children, and Wife.

### Wife's Testimony: A Heated Argument

{¶19} Wife was called as a State's witness. Wife testified that she came home from work and saw that Cunningham was arguing with Stepdaughter. She inserted herself into the heated argument, told everyone to calm down, and to have dinner. She denied being touched or pushed by Cunningham. She denied that Cunningham threatened her with a knife. She denied that Cunningham threatened Stepdaughter with a gun.

{¶20} The State made a motion to treat Wife as a hostile witness, which the trial court granted. (T. 163).

{¶21} The State played a portion of State's Exhibit D. Wife testified the video showed she did not confirm or deny Cunningham's alleged actions. She stated she suffered from post-traumatic stress syndrome and while she spoke with Deputy Waite,

she was suffering from mental distress that prevented her from recalling what happened and she was uncomfortable speaking with the officer.

{¶22} Wife testified that Stepdaughter and Stepson wanted to live with their biological father, and she learned they were having conversations about how to make that happen.

## Crim.R. 29 and Jury Verdict

{¶23} The State rested and Cunningham moved for a dismissal of the domestic violence and child endangering charges pursuant to Crim.R. 29. (T. 360). The trial court denied the motion. The defense then rested its case. (T. 370).

{¶24} The jury was charged and returned its verdict, finding Cunningham guilty of Aggravated Menacing as to Wife, Aggravated Menacing as to Stepdaughter, Domestic Violence as to Wife, Domestic Violence with Threats as to Wife, Domestic Violence with Threats as to Stepdaughter, Child Endangering as to Stepdaughter, and Child Endangering as to Stepson. The jury found Cunningham not guilty of the two charges of Child Endangering as to the two younger siblings.

## Sentencing

{¶25} The trial court held a sentencing hearing on March 9, 2022. The sentence was journalized via judgment entry filed on March 9, 2022.

{¶26} The trial court imposed a 180-day sentence of actual incarceration on Count (A). The trial court next sentenced Cunningham to 180 days suspended on Count (B), 180 days suspended on Count (C), 30 days suspended on Count (D), 30 days suspended on Count (E), 180 days suspended on Count (F), and 90 days suspended on Count (G).

{¶27} For purposes of sentencing, the trial court merged Count (A) Aggravated Menacing as to Wife with Count (D) Domestic Violence Threats as to Wife and ordered Counts (A) and (D) to run consecutive to Count (C) Domestic Violence as to Wife.

{¶28} The trial court next merged Count (B) Aggravated Menacing as to Stepdaughter, Count (E) Domestic Violence Threats as to Stepdaughter, and Count (F) Child Endangering as to Stepdaughter for purpose of sentencing. Counts (B), (F), and (E) were to run consecutive to all other Counts.

{¶29} For the offenses involving Stepson, the trial court ordered Count (G) Child Endangering to run consecutive to all other counts.

{¶30} The trial court then imposed community control sanctions including non-reporting probation for five years, a mental health evaluation, and the completion of an anger management program. Cunningham was also ordered to stay away from, have no contact with, and not enter the premises of Wife, Stepson, Stepdaughter, and the two younger children at the Rushville home. The parties were allowed to be together to participate in family counseling.

**Appeal**

{¶31} Cunningham filed an appeal of the March 9, 2022 sentencing entry with this Court on March 11, 2022.

{¶32} On March 11, 2022, Cunningham filed a motion with the trial court to suspend the execution of his sentence. The trial court denied the motion on March 16, 2022. On March 16, 2022, Cunningham filed a motion to suspend execution of sentence with this Court. We remanded the matter to the trial court for the purposes of having the trial court explain its reasons in support of denying the request for stay. The trial court

filed its judgment entry on May 13, 2022. On May 18, 2022, we denied Cunningham's motion to suspend execution of sentence.

### ASSIGNMENTS OF ERROR

{¶33} Cunningham raises four Assignments of Error:

{¶34} "I. THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

{¶35} "II. THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶36} "III. THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

{¶37} "IV. THE TRIAL COURT ERRED WHEN IT IMPOSED THE MAXIMUM SENTENCE ON THE HIGHEST DEGREE OFFENSE."

### ANALYSIS

### I. and II. Sufficiency and Manifest Weight of the Evidence

{¶38} In his first and second Assignments of Error, Cunningham contends his convictions were against the sufficiency and manifest weight of the evidence. We disagree.

{¶39} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence

to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶40} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶41} Cunningham was charged and convicted of multiple violations of the Ohio Revised Code. We review each conviction in turn.

### Aggravated Menacing

{¶42} Cunningham was convicted of two counts of Aggravated Menacing as to Wife and Stepdaughter, a first-degree misdemeanor in violation of R.C. 2903.21(A). The statute reads in pertinent part:

(A) No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's

immediate family. In addition to any other basis for the other person's belief that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family, the other person's belief may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

{¶43} Cunningham first argues that his conviction for aggravated menacing as to Wife was not supported by the sufficiency and manifest weight of the evidence. Wife testified at trial that on November 15, 202, Cunningham did not cause her to believe that he would cause serious physical harm to her or her children. The video evidence and the testimony of Stepdaughter, Stepson, Sergeant Walker, and Deputy Waite contradicted Wife's testimony. Stepson testified that when he witnessed Cunningham hold a knife to Wife's throat, he heard her yelp. He testified that when Cunningham held the loaded gun to Stepdaughter's head, Wife was present. Sergeant Walker and Deputy Waite testified that Wife appeared fearful to them, with shaking hands and a quivering voice. When Deputy Waite confronted Wife with the statements of her children, Wife began to cry. She told Deputy Waite that she had honest children. In the State's Exhibit D, Wife did not deny Cunningham's actions towards her or the children on November 15, 2021.

{¶44} Cunningham next argues there was likewise insufficient evidence of aggravated menacing towards Stepdaughter because she never saw the gun held to her head. She only heard Cunningham call her names. We point to Stepdaughter's testimony where she stated she did not feel fingers on her head, but the metal touch of a gun. As

he held the gun to her head, Stepdaughter testified that Cunningham told her to pull the trigger and to go die. She testified that in that moment, she feared for her life. Deputy Waite found an operational Sig Sauer, with a bullet in the chamber, in the waist band of Cunningham's pants.

{¶45} We have frequently recognized that the jurors in a criminal trial "as the firsthand triers of fact, [are] patently in the best position to gauge the truth." *State v. Jones*, 5th Dist. Richland No. 2016 CA 0045, 2017-Ohio-8633, 2017 WL 5565501, ¶ 59 citing *State v. Frazier*, 5th Dist. Stark No. 2010CA00042, 2011–Ohio–434, ¶ 23. Furthermore, while a jury may take note of inconsistencies and resolve or discount them accordingly, such inconsistencies do not render a defendant's conviction against the manifest weight of the evidence. *See State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714. Upon this record, considering the evidence in a light most favorable to the State, there was sufficient evidence that any reasonable trier of fact could have found the essential elements of aggravated menacing as to Wife and Stepdaughter were proven beyond a reasonable doubt. The jury did not lose its way to create a manifest miscarriage of justice when it found Cunningham guilty of aggravated menacing as to Wife and Stepdaughter.

<u>Domestic Violence and Domestic Violence with Threats</u>

{¶46} Cunningham was convicted of Domestic Violence against Wife, in violation of R.C. 2919.25(A), and Domestic Violence with Threats against Wife and Stepdaughter, in violation of R.C. 2919.25(C). The statute reads:

(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.

\* \* \*

(C) No person, by  threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member.

{¶47} Wife testified at the trial that Cunningham did not push her, she did not fall, and he did not hold a knife to her throat. The testimony of Stepson and Stepdaughter contradicts Wife's testimony. They testified they witnessed Cunningham push Wife, causing her to fall. They saw him hold a knife to her throat. Stepson was so concerned that he texted his biological father the details of what he saw and asked him to call the police. Stepdaughter testified that she felt Cunningham put a gun to her head. She heard him tell her to pull the trigger and to go die. Wife denied in her testimony that event occurred. Wife and the children agreed that Cunningham ripped a cabinet door off the hinges during the arguments.

{¶48} "When there is a conflict in the testimony of witnesses, it is for the trier of fact to determine the weight and credibility to be given to such evidence." *State v. York*, 3rd Dist. Union No. 14-21-14, 2022-Ohio-1626, 2022 WL 1538021, ¶ 87 quoting *State v. Robinson*, 12th Dist. Butler No. CA2018-08-163, 2019-Ohio-3144, ¶ 29. The jury may "take note of any inconsistencies in the testimony and resolve them accordingly, believing all, part, or none of each witness's testimony." *State v. Lark*, 12th Dist. Fayette No. CA2018-03-004, 2018-Ohio-4940, ¶ 29. Ultimately, "'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.'" *State v. Smith*, 3rd Dist. Marion No. 9-20-50, 2021-

Ohio-3404, ¶ 26, quoting *State v. Ferrell*, 10th Dist. Franklin No. 19AP-816, 2020-Ohio-6879, ¶ 59.

{¶49} The jury in this case did not find Wife's testimony credible after considering the other witnesses' testimony and the body cam video evidence. There was sufficient evidence to support the jury's finding that the elements of Domestic Violence under R.C. 2919.25(A) and (C) were met. The jury did not lose its way and create a manifest miscarriage of justice in convicting Cunningham for Domestic Violence.

<u>Endangering Children</u>

{¶50} Cunningham finally argues his conviction for Endangering Children as to Stepdaughter and Stepson under R.C. 2919.22(A) was against the sufficiency and manifest weight of the evidence. The statute reads:

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

{¶51} On November 15, 2021, Stepson was 12 years old, and Stepdaughter was 13 years old. Stepdaughter and Stepson lived with Wife and Cunningham on alternating weeks. The evidence in this case showed that on November 15, 2021, while children were present, Cunningham ripped a kitchen cabinet door off the hinges and threw it. Stepdaughter and Stepson witnessed Cunningham push their mother and cause her to fall. The minor children were present to see Cunningham hold a knife to their mother's

throat. Stepdaughter felt Cunningham hold a gun to her head and make threats of violence to her, which Stepson heard.

{¶52} We note that Cunningham was originally charged with endangering children as to the four children in the home on November 15, 2021. The jury found Cunningham not guilty of endangering children as to the two younger children. The jury's not guilty findings show it considered the evidence and discerned the State demonstrated beyond a reasonable doubt that Cunningham committed the offense of endangering children as to only Stepdaughter and Stepson.

{¶53} Upon our review, we find sufficient evidence to support the charges for endangering children and no manifest miscarriage of justice.

{¶54} Cunningham's first and second Assignments of Error are overruled.

### III. Misdemeanors and Consecutive Sentences

{¶55} In his third Assignment of Error, Cunningham argues the trial court erred when it imposed consecutive sentences because the trial court failed to make the statutory findings necessary to support consecutive sentences.

{¶56} At the March 9, 2022 sentencing hearing, the trial court stated,

THE COURT: So all one case number, but I'll impose with regard to [Wife] and the aggravated menacing, 180 days. Let's see. For the purposes of – and 180 days imposed on the DV. For purposes of the DV threats, I'll impose 30 days, but that merges for purposes of – so with regard to those three charges, we have a total of 360 days. With regard to [Stepdaughter], 180 days on the ag menacing charge, 180 days on the endangering children, 30 days on the Domestic violence threats. Those would merge

through to 180 days so we'll merge those to the aggravated menacing for

purposes of that. And then 180 days on the other endangering children case

with * * * [Stepson]. So a total of 720 days imposed. I'm going to order five

years probation.

* * *

These are tough. I mean I want to be fair to you, Mr. Cunningham, as well

as – but, you know, based on the circumstances and everything involved in

this case, I'm going to impose of the 720 days – I am going to impose 180

days to be served and suspend 540 of those days.

(T. 50, 53). The trial court did not state on the record that the sentences were to be served

consecutively. In the March 9, 2022 Final Judgment Entry, the sentencing entry stated in

pertinent part, "Jail sentences on each count are consecutive."

{¶57} R.C. 2929.41(B) reads in pertinent part:

(B)(1) A jail term or sentence of imprisonment for a misdemeanor shall be

served consecutively to any other prison term, jail term, or sentence of

imprisonment when the trial court specifies that it is to be served

consecutively or when it is imposed for a misdemeanor violation of section

2907.322, 2921.34, or 2923.131 of the Revised Code.

{¶58} Cunningham argues the trial court failed to make the statutory findings for

consecutive sentences pursuant to R.C. 2929.14(C)(4). Cunningham was not convicted

of any felonies, only misdemeanors. "R.C. 2929.14(C)(4) does not apply to a conviction

that includes consecutive service of misdemeanor jail terms." *State v. Alexander*, 8th Dist.

Cuyahoga No. 102708, 2016-Ohio-204, 2016 WL 299272, ¶ 2.

{¶59} The Eleventh District Court of Appeals analyzed the issue of consecutive misdemeanor sentences in *State v. Bechtel*, 11th Dist. Lake No. 2019-L-145, 2020-Ohio-4889, 2020 WL 6042383, ¶ 17, appeal not allowed, 161 Ohio St.3d 1440 (2021). In that appeal, the defendant was convicted of eight second-degree misdemeanors and the trial court ordered her to serve eight 90-day jail sentences (which equaled 720 days in the aggregate) but suspended the jail time. *Id.* at ¶ 5-6. The trial court did not state at the sentencing hearing or in the sentencing entry whether the sentences were to be served concurrently or consecutively. The defendant argued in her assignment of error that the sentence was contrary to law because the trial court failed to make the statutory findings necessary to support consecutive sentences. The court of appeals stated:

> [R.C. 2929.41(B)(1)] does not prescribe how a sentencing court is to specify that a misdemeanor jail term is to be served consecutively. The statute neither requires the court to use particular language when ordering sentences to  be served consecutively  nor mandates whether the specification be made at the sentencing hearing or in the sentencing entry. While ambiguity as to whether sentences are to be served concurrently or consecutively should be construed in the defendant's favor, *State v. Wright*, 8th Dist. Cuyahoga No. 107213, 2019-Ohio-1361, ¶ 15, we find no such ambiguity in the present case.

*Id.* at ¶ 17.

{¶60} The Eleventh District found that because the defendant would be subject to 720 days in jail if she violated community control, the trial court effectively specified that the suspended sentences were to be served consecutively. *Id.* at ¶ 18. In this case, we

find no ambiguity because the trial court specified in the March 9, 2022 final judgment entry that Cunningham's sentences were to be served consecutively. R.C. 2929.41(B)(1) does not require the trial court use particular language when ordering sentences to be served consecutively. *State v. Alexander*, 8th Dist. Cuyahoga No. 102708, 2016-Ohio-204, 2016 WL 299272, ¶ 2. Further, the Eighth District Court of Appeals has held that R.C. 2929.14(C)(4) is limited to the imposition of consecutive "prison terms" and not "jail terms." *State v. Alexander*, 8th Dist. Cuyahoga No. 102708, 2016-Ohio-204, 2016 WL 299272, ¶ 6 citing *State v. Peterson*, 8th Dist. Cuyahoga No. 102428, 2015–Ohio–4581, ¶ 7; *State v. Maloney*, 12th Dist. Clermont No. CA99–01–006, 1999 Ohio App. LEXIS 4600, *7,1999 WL 760923 (Sept. 27, 1999); *State v. Kroger*, 12th Dist. Clermont No. CA99–05–050, 2000 Ohio App. LEXIS 1393,2000 WL 342130 (Apr. 3, 2000). The court of appeals clarified:

> "Prison" is defined as a residential facility used for the confinement of convicted felony offenders under the control of the Department of Rehabilitation and Correction. R.C. 2929.01(AA). On the other hand, "jail term" is defined as a jail sentence imposed pursuant to the misdemeanor sentencing statute, R.C. 2929.24. Prison and jail are two separate types of imprisonment.

*Id.*

{¶61} We find no error for the trial court to impose the misdemeanor sentences to be served consecutively without making statutory findings pursuant to R.C. 2929.14(C)(4). Cunningham's third Assignment of Error is overruled.

### IV. Maximum Sentence

{¶62} In his fourth Assignment of Error, Cunningham argues the trial court abused its discretion when it ordered Cunningham to serve a jail term of 180 days. We disagree.

{¶63} Generally, misdemeanor sentencing is within the sound discretion of the trial court and will not be disturbed upon review if the sentence is within the limits of the applicable statute. *State v. Thadur*, 2016-Ohio-417, 59 N.E.3d 602, ¶ 11 (5th Dist.), citing *State v. Smith*, 9th Dist. Wayne No. 05CA0006, 2006-Ohio-1558, 2006 WL 826128, ¶ 21, internal citation omitted. *See also State v. Chadwick*, 5th Dist. Knox No. 08CA15, 2009-Ohio-2472, 2009 WL 1485036, ¶ 30. To find an abuse of discretion, the reviewing court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Furthermore, there is no requirement that a trial court, in sentencing on misdemeanor offenses, specifically state its reasons on the record. *State v. Harpster*, 5th Dist. Ashland No. 04COA061, 2005-Ohio-1046, 2005 WL 567319, ¶ 20.

{¶64} The 180-day jail term is within the statutory range for a misdemeanor of the first degree. R.C. 2929.24(A)(1). In his appellate brief, Cunningham concedes the 180-day jail term is not contrary to law.

{¶65} R.C. 2929.21(A) first states that "[a] court that sentences an offender for a misdemeanor * * * shall be guided by the overriding purposes of misdemeanor sentencing." The overriding purposes of misdemeanor sentencing are to protect the public from future crime by the offender and others and to punish the offender. R.C. 2929.21(A). To achieve those purposes, a sentencing court must consider "the impact of

the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." *Id.*; *Thadur,* 2016-Ohio-417, 59 N.E.3d 602 at ¶ 13, citing *State v. Coleman*, 4th Dist. Scioto No. 05CA3037, 2006-Ohio-3200, 2006 WL 1719348, ¶ 21.

{¶66} In addition, R.C. 2929.21(B) states in pertinent part as follows: "A sentence imposed for a misdemeanor * * * shall be reasonably calculated to achieve the two overriding purposes of misdemeanor sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar offenses committed by similar offenders."

{¶67} Thus, under R.C. 2929.21(A) and (B), to achieve the purposes of protecting the public from future crime and punishing the offender, the sentencing court is to inter alia consider the offender's conduct, the impact of the offender's conduct on the victims, and the consistency of the sentence with sentences for similar offenses. S*tate v. Frank*, 2018-Ohio-5148, 127 N.E.3d 363, ¶ 55 (5th Dist.) citing *Thadur*, 2016-Ohio-417, 59 N.E.3d 602 at ¶ 15.

{¶68} At the sentencing hearing, Cunningham's trial counsel objected to the sentence and argued he had never encountered a 180-day jail term imposed for a defendant who had not inflicted any injuries on the victims and was fully compliant while on bond. (T. 53-54, 55). The trial court responded that based on the egregious facts of the case that involved Cunningham putting his gun to the head of minor child Stepdaughter and a knife to the throat of Wife based on an argument over the use of

pronouns, the sentence was appropriate. (T. 56). Upon a review of the record in this case, we find no abuse of discretion by the trial court to sentence Cunningham to a term of 180 days in jail. The sentence is within the statutory range for a misdemeanor of the first degree. The sentencing hearing demonstrates the trial court considered the purpose of protecting the public from future crime and punishing Cunningham, while considering Cunningham's conduct towards Stepdaughter, Stepson, and Wife and the consistency of the sentence with sentences for similar offenses.

{¶69} The fourth Assignment of Error is overruled.

## CONCLUSION

{¶70} The judgment of the Fairfield County Municipal Court is affirmed.

By: Delaney, J.,

Gwin, P.J. and

Wise, John, J., concur.